James K. RITTERBUSCH, (Fulton State Hospital), Respondent,

v.

Clell Omar SPEAKS, Appellant.

No. WD 30988.

Missouri Court of Appeals, Western District.

Aug. 4, 1980.

D. James Mariea of Whitlow, Riley, Mariea & Dunlap, Fulton, for appellant.

John Ashcroft, Atty. Gen., Teresa Aloi Angle, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is an appeal from a judgment in the form of an order for involuntary detention and treatment following a jury finding of mental illness. The proceedings, civil in nature, were initiated pursuant to Chapter 202, RSMo 1978. Motion for new trial was timely filed and overruled. The judgment is affirmed.

Appellant presents one point for review. In this point, he alleges the trial court erred in admitting the opinion of the medical expert witness because the opinion was permitted without proper foundation in fact and based upon reports which were hearsay.

The evidence reveals that appellant was first a patient in Fulton State Hospital in 1965. He was there for a period of some two weeks. He again became a patient in 1973 and continued to remain at the facility until he walked away on January 28, 1978. In addition, he was a patient at the facility from February 2, 1978 to August 1, 1978. Between 1973 and 1978, he had left, on some five or six other occasions, the facility without authorization.

On November 5, 1978, appellant came into contact with a Missouri highway trooper who had responded to a call at a service station upon someone's failure to pay for gasoline. The trooper observed a vehicle (which was being operated by appellant), followed the vehicle, and when the vehicle came to a stop in a private driveway, confronted appellant and informed him of his (appellant's) alleged failure to pay for the gasoline.

At trial, the trooper described his attempt to discuss the gasoline purchase with appellant, stating that appellant was not intoxicated, but that his conversation was incoherent. The trooper stated that appellant placed a screwdriver under his (the trooper's) chin, which broke the skin, and then attempted to gain possession of his service revolver. The parties wrestled to the ground and the trooper subdued appellant and took him into custody. The trooper related the following conversation between himself and appellant:

"Q. Did he say anything to you at that time?

A. Yes he did. He said, he made the statement to me that I must be a righteous man because he couldn't kill me, and I asked him how come he would say that and he said, well, the Lord has told me, or I asked the Lord to not let me kill a righteous man.

\* \* \* \* \* \*

Q. Sergeant Fitzgerald, what were the facts that he related to you that he wanted you to investigate?

A. As I said he was at times he was nearly incoherent, he conveyed the fact that he was a man of God, and that God had sent him on a mission, they, quote, had implanted a transmitter in his brain and controlled him, that the world was in a terrible shape, things such as this.

Q. What did he say with respect to the world being in terrible shape, did he say anything else? Why was it in terrible shape?

A. No. Like I say, he wasn't entirely coherent all of the time and as I've said, he was vague on who was doing these things to him, it was always they were doing this and unable to get who they were."

Additional evidence revealed that appellant, around the first day of February, 1978, had been in a local tavern and law enforcement authorities were called to the establishment. Appellant had, in his possession, a length of pipe and was swinging it around. The authorities subdued appellant and took him into custody.

The evidence continued with the testimony of the Sheriff of Adair County. The Sheriff stated he had been acquainted with appellant some 5–6 years and that on some of these occasions, while appellant was being detained in the county jail awaiting return to Fulton Hospital, he had visited with appellant. The Sheriff was asked to elaborate upon what appellant said during these conversations. As a result of this inquiry, the following colloquy took place:

"Q. Did he say anything during your conversations with him that you regard as unusual?

A. The only thing that I would say, Clell says that he is a religious man and he, the Lord, he has power of the Lord.

Q. What does he mean by that, does he say?

A. Well, in the conversations that we have, this old country is in bad shape and Clell, the Lord has given Clell maybe the powers to clean it up.

Q. Did he say what powers the Lord has given him?

A. Yes, he has said that the Lord has give [sic] him the rights, that he could take a life.

Q. Do you recall how recently he said that to you?

A. Well, it's almost every time that he's ever in jail, I've talked to Clell and it's always the same religion."

Respondent's evidence concluded with the testimony of Dr. Elmer Jackson, a staff psychiatrist at Fulton Hospital. Dr. Jackson testified he had been on the staff of Fulton Hospital some 18 years, had known appellant since 1965, and that since 1973, had, on various occasions, the opportunity to examine and observe appellant.

The particular portion of the psychiatrist's testimony which is attacked on this appeal on the basis of improper foundation is found on the record as follows:

"Q. Doctor, have you had on occasion an opportunity to examine and observe Mr. Speaks with respect to his mental condition?

A. Yes, I have.

Q. Have you done so recently?

A. Yes. The last time was on March the 15th, what I call a comprehensive exam, of course I see him almost daily, that is during the weekdays.

Q. You say you have seen him almost daily, since what date have you seen him almost daily?

A. Well, the last two months, the first week in February.

Q. Doctor, have you been able to form an opinion as to whether or not Mr. Speaks' mental condition is impaired at this time?

A. Yes, I do have an opinion.

Q. What is your opinion?

MR. MARIEA: (attorney for Speaks): I'm going to object to the opinion, the reason that a proper foundation has not been laid with reference to testing for any defect that may exist.

THE COURT: Objection will be overruled.

Q. What is that opinion, Doctor?"

Before this court, appellant argues that no foundation had been laid upon which an expert opinion could be premised. Further, he argues that the opinion was not coached in hypothetical language so as to allow the jury to assume as true, if it chose to do so, other evidence presented at trial. This court has difficulty in following the latter

portion of appellant's argument on the question, and concludes that appellant argues it was mandatory that a hypothetical question should have been presented to the expert witness. The objection on the record does not include reference to a hypothetical question, but this court will consider the same as if briefed, see *State v. Grapper*, 328 S.W.2d 633 (Mo.1959).

■ The question of evidence in the form of an expert opinion has been before our court on prior occasions, and it is clearly established that a medical opinion which relates to the mental condition or capacity of a person can be premised upon the expert's observations, and there is no need for the presentment of a hypothetical question. See *State v. Burton*, 544 S.W.2d 60 (Mo. App.1976) wherein at 67 the court declared, "The record also shows that the questions to them were not hypothetical, but called only for their expert opinions, based on their observations of defendant, whether he suffered from mental disease or defect . ." Such opinions may be based on the expert's own observation, *Smarr v. Smarr*, 319 Mo. 1153, 6 S.W.2d 860, 865 (1928); and when the expert has a personal observation, hypothetical questions are unnecessary to obtaining his opinion, *De Donato v. Wells*, 328 Mo. 448, 41 S.W.2d 184 (1931). See also *State v. Grapper, supra,* at 635 for the principle that, "Whether the doctor had, and could state, an opinion of defendant's condition in January 1957 from his own examination and observations, was a medical question, not a legal one . . . It has been held that the pertinent facts in evidence need not be incorporated into questions which merely require expert witnesses to testify 'directly from their own knowledge * * *.' "

The evidence in the instant case reveals appellant had been observed and examined on various occasions by Dr. Jackson for a period spanning some five years. The doctor was asked and did testify as to his expert opinion concerning the mental condition of appellant directly from his own observations and examinations. Such opinion testimony was admissible and there was no

error in the trial court's overruling of appellant's objection on the basis of improper foundation, or, as later argued, the absence of a hypothetical question. The record reveals that at no time were the qualifications of the expert witness ever challenged or questioned by appellant, see *State v. Burton* and *State v. Grapper, supra.*

Appellant's attack on the opinion of the expert witness is further broadened on the basis that said opinion was, in part, premised upon "certain reports" which were hearsay, inflammatory in nature and prejudicial to appellant. On this precise point, the record reveals the following:

"A. My opinion is that he does have mental illness.

Q. Are his mental processes impaired?

A. Yes, they are.

Q. Doctor, in what way are they impaired?

A. Well, they're impaired mainly in two ways and the first is thought. Thinking disorder and this thinking is impaired because it's unrealistic, that is, it's unreal as the way an ordinary person would see things, sees them from a different view point.

Q. You said there were two reasons you think his . . .

A. Yes, the thinking and then behavior, which is based on the reasons for admissions to the hospital and the reasons for return. The type of behavior that's been described in his home community.

Q. Had you heard that the Sheriff, that Sergeant Fitzgerald was attacked with a . . .

MR. MARIEA: I'm going to object, the question's asking for hearsay your honor.

THE COURT: Sustained.

Q. Doctor, what is this behavior that you're talking about that you based your opinion that his mental processes are impaired on?

A. Well, on the basis of two reports from the Sheriff of Adair County . . .

MR. MARIEA: I would object to the witness testifying as to hearsay, he's identified his source of information as reports rather than his own observations.

MS. GARBER: (prosecuting attorney) Judge, it's what his medical opinion is based on and it's already been entered into evidence.

THE COURT: I think he can testify to it, the objection will be overruled.

A. Based on two reports from the Sheriff and on report of course that he was in a bar or tavern and the Sheriff was called, and several of the patrons had said they were threatened and of course  .  .  .

Q. Doctor  .  .  .

MR. MARIEA: Your honor, may I have continuing objection to, I don't want to interrupt the Doctor every time he speaks but on the other hand I do believe that this is hearsay, that the witnesses could have been called earlier to testify to this sort of thing, I don't think the doctor should testify to what he has read about or heard about from a third person.

MS. GARBER: Judge, It's a little difficult for him to guess what might have been said and introduced into evidence earlier and therefore what might be proper for him to say now, and if the Court would allow me, I would ask him the questions as to what his medical  .  .  .

THE COURT: I think the Doctor is going to have to show what he bases his medical opinion on which is obviously hearsay. I'm going to overrule the objection but Mr. Mariea, it will be understood that your objection runs to this entire line of testimony.

MR. MARIEA: Thank you your honor.

THE COURT: Proceed.

Q. Doctor, have you had another report about the patient that you based your medical opinion on?

A. Yes, the report given on the original admission in 1973 where it was reported that he had been on drugs and had attempted to choke his mother, threatened his sister and was apprehended by police officers and brought to Fulton State Hospital.

Q. I see. Doctor, do you have an opinion as to whether or not Mr. Speaks has delusions?

A. Yes, I do have.

Q. What is that opinion?

A. The opinion is that he does have delusions.

Q. What sort of delusions does he have, Doctor?

A. Well, his delusions are connected with religion, with his religious experiences in which he stated that he was filled with the spirit for a period of at least seven years, and that he was an agent of God and could tell whether people were good or bad and the other delusion is that he has a radio transmitter in his head that was placed there at some time, he isn't sure, but it was during a one month period, and that there is, he has been struck by a laser beam.

Q. Doctor, do you have an opinion as to whether or not these delusions distort Mr. Speaks' ability to recognize reality?

A. Yes, in those particular areas.

Q. I'm sorry, I don't understand what you mean by that?

A. Well, I mean, in delusion we speak of them as fixed, a circumscribe and they are just delusions in that particular area which would have to do with religion but it may not spread to other areas of his thinking.

Q. I see. Do you have an opinion as to whether or not Mr. Speaks' mental condition interferes with his ability to reason or to understand or to exercise conscious control over his actions?

MR. MARIEA: Your honor, I'm going to object to first the form of the question because it's multiple in nature, secondly, because I don't believe there's a foundation laid for that question.

THE COURT: In what way, Mr. Mariea?

MR. MARIEA: Your honor, she's covered about three or four different areas on that question and I'm unable to separate exactly what the Doctor's being asked or what we have a foundation for in the question.

THE COURT: Can you reword your question?

Q. I think so. Doctor, do you have an opinion as to whether or not Mr. Speaks' mental condition interferes with his ability to reason?

A. Yes.

Q. What is that opinion?

A. I think that it does, especially when under the influence of alcohol.

Q. Do you have an opinion as to whether or not Mr. Speaks' mental condition interferes with his ability to understand?

A. Yes, to some degree, especially in the areas we just mentioned of delusion areas.

Q. Do you have an opinion as to whether or not Mr. Speaks' mental condition interferes with his ability to exercise conscious control over his actions?

A. Yes I do.

Q. What is that opinion?

A. My opinion is that he does not at all times or otherwise would not have necessitated repeated returns to the hospital.

Q. Doctor, in the field of psychiatric medicine, is there a classification into which persons who are commonly placed who suffer from the symptoms that you have observed and told us about in Mr. Speaks?

A. Yes, there is.

Q. What is that classification?

A. The classification is broadly known as psychosis and more specifically, it's paranoid schizophrenia."

The police reports were never introduced into evidence.

The question to be resolved is whether the admission of the expert opinion, which was based in part on hearsay, was prejudicial error. There is no question that permitting that portion of the expert's testimony based on the police reports was error because as those reports related to the expert's testimony, the reports were hearsay. The question again stated, however, is whether such error was prejudicial error, see *Schears v. Missouri Pacific Railroad Company*, 355 S.W.2d 314 (Mo. banc 1962).

In the instant case, the record, in summary, reveals that the two "police reports" (or more accurately the events to which the reports attended) were testified to by two law enforcement officers. On the issue of appellant's mental status, the expert, in addition to and over and above the two reports, testified to having known, examined and worked with appellant in the state facility for a period of some five years. The evidence revealed the expert had personal, continued contact with appellant. The expert was qualified to diagnose and treat persons with problems similar to those faced by appellant. The testimony of the expert, in addition to the reports, was sufficient unto itself to support the rendering of his opinion regarding appellant's mental condition.

Subsequent to the above-referred-to testimony, appellant himself took the witness stand and testified to the events referred to in the two police reports.

What is presented here is the fact that the expert's testimony surrounding the events contained in the two police reports is based on hearsay. The accepted procedural approach in such instances is to offer to the expert a hypothetical question which includes those elements not within his personal knowledge, see *Schears v. Missouri Pacific Railroad Company, supra.* The failure to do so, however, is not prejudicial error if the question asked is based upon evidence otherwise competent, see *Gray v. Koplar-Barron Realty Co.*, 497 S.W.2d 185 (Mo.App. 1973). That is precisely the situation in the instant case, and the error lends itself, under the particular facts of the instant case,

to the format or form of the question; and because of the particular circumstances surrounding the competency of the evidence on this point in the instant case, there is no prejudicial error resulting from the answer given over the objection of the appellant.

 Within the argument portion of his brief, appellant attempts to enlarge still further his attack upon the entire testimony of the expert witness upon the basis that he made a standing objection on the record. While it has been pointed out that appellant's objection was directed to the police reports because they were hearsay, and that as a result of the particular circumstances in the evidence of this case no prejudicial error is found relative to that evidence, it does not follow, as contended by appellant, that his objection was applicable to all of the testimony of the expert witness. The net effect is that appellant's objection went to the matter of the police reports. Although contrary to his argument, appellant's objection does not relate to the remainder of the testimony of the expert witness, and since no additional objection is raised, the issue, since not preserved in timely fashion, leaves nothing for this court to review, see *Stafford v. Lyon,* 413 S.W.2d 495 (Mo.1967).

 The evidence upon this record supports the finding that appellant suffers from mental illness and, under the statute, continues to present a likelihood of serious physical harm to himself or others. The record reveals that appellant is in need of continued detention and treatment. The record further reveals that appellant was accorded due process and there is no error in the trial of the issues attending thereto.

One final matter remains to be resolved. Pending the appeal, appellant's attorney filed his application for additional attorney fees. A detailed list of expenses and time expended was provided this court. This application was ordered by this court to be taken with the case.

The record reveals appellant is an indigent person. Counsel for appellant represented appellant continuously from the date of his appointment by the circuit court to the point of final disposition on appeal. Counsel has expended time, employed his expertise as counsel for appellant and incurred actual out-of-pocket expenses in the pursuit of appellant's interest.

By virtue of services rendered and upon careful survey of counsel's application, it is hereby ordered that appellant's counsel be awarded the sum of $750.00 as attorney's fees and as reimbursement for expenses. The circuit court is hereby directed to take all necessary action to provide for the payment of said $750.00.

Upon the foregoing reasons, the point raised by appellant is ruled against him and the judgment is in all respects affirmed.

All concur.