Joseph BLUMER, Plaintiff/Appellant,

v.

Mary MANES and Cheryl Kennedy,
Defendants/Respondents.

No. ED 88189.

Missouri Court of Appeals,
Eastern District,
Division Four.

Sept. 11, 2007.

John C. Garavaglia, Paul J. Seele, Saint Louis, MO, for Plaintiff/Appellant.

Robert J. Selsor, Bryan D. Lemoine, John M. Challis, Saint Louis, MO, for Defendants/Respondents.

SHERRI B. SULLIVAN, J.

*Introduction*

Joseph Blumer (Appellant) appeals from the trial court's grant of summary judgment in favor of Mary Manes and Cheryl Kennedy (collectively Respondents) on Count I of Appellant's first amended petition in equity, seeking to set aside a trust amendment. We reverse and remand.

*Factual and Procedural Background*

Appellant and Deloris Blumer (Decedent) were married from November 17, 1951, until Decedent died on October 23, 2004. On May 28, 1999, Decedent created the "Deloris Blumer Living Trust" (trust), which, among other things, provided that upon Decedent's death, Appellant would become successor trustee of the trust and

two specific properties would be held in trust for Appellant's benefit for his life. On August 28, 2004, Decedent executed the "First Amendment to Deloris Blumer Living Trust" (trust amendment or amendment), which removed Appellant as successor trustee upon Decedent's death, and changed the disposition of the two aforementioned properties. The amendment provided that one of the properties would go directly, free of trust, to Respondents; and the other property would be held in trust by Respondents with Appellant being able to occupy it for six months following Decedent's death, with an option to purchase it after that time for its appraised value at the time of Decedent's death.

Appellant filed a Petition alleging that the trust amendment was invalid because Decedent lacked the requisite mental capacity to execute it and because it was procured by Respondents' undue influence (Count I); and that Respondents tortiously interfered with his inheritance (Count II). The trial court dismissed Count II upon Respondents' motion and Appellant is not now appealing that dismissal. The trial court also granted Respondents' motion for summary judgment on Count I of Appellant's petition. Appellant appeals from that judgment.

## Points Relied On

Appellant presents three points in his appeal. In his first two points, which we combine for discussion, Appellant contends the trial court erred in granting summary judgment for Respondents because they failed to prove that there was no genuine issue of material fact as to their lack of undue influence on Decedent, or as to Decedent's lack of mental capacity to amend the trust. In his third point, Appellant asserts that the trial court erred in considering and relying upon certain hearsay evidence in granting summary judgment for Respondents.

## Standard of Review

The trial court shall enter summary judgment only if the motion, the response, and the reply show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Mo. R. Civ. P. 74.04(c)(6). We review the grant of summary judgment essentially de novo. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.banc 1993). The record is reviewed in the light most favorable to the party against whom judgment was entered, and the non-movant is given the benefit of all reasonable inferences from the record. *Id.*

## Discussion

In the instant case, Respondents' motion for summary judgment essentially asserts that Appellant has not and will not be able to prove that: (1) it was not Decedent's intent to leave the property to Respondents; (2) there was any undue influence exercised by Respondents over Decedent to execute the amendment; or (3) Decedent suffered from any mental incapacity.

Summary judgment is rarely appropriate in cases involving proof of such elusive facts as intent, motive, fraud, duress, undue influence, mental capacity, and the like—which must in nearly every case be proved by circumstantial evidence. *Estate of Heidt,* 785 S.W.2d 668, 670 (Mo.App. W.D.1990).[1]

---

1. In *Heidt,* summary judgment was granted only because the non-movants, by failing to respond to the movant's requests for admission or to contradict by opposing affidavits the movant's affidavits, essentially admitted all of the facts presented by the movant in support of her motion. *Id.*

*Undue Influence*

■ A presumption of undue influence arises where substantial evidence shows: (1) a confidential and fiduciary relationship; (2) that the fiduciary obtained a benefit; and (3) some additional evidence from which there is an inference of undue influence. *In re Estate of Goldschmidt,* 215 S.W.3d 215, 221 (Mo.App. E.D.2006). When a presumption of undue influence is supported by substantial evidence, a submissible case is made and the case should go to the jury even if there is contrary evidence. *Id.* In determining whether a plaintiff has made a submissible case of undue influence, a case-by-case analysis is usually required because the exercise of undue influence is often proved by circumstantial evidence. *Id.* To test whether the prima facie case—i.e., the presumption of undue influence—has been satisfied, a court must look at the evidence favoring the non-moving party, even though the party alleging undue influence has the burden of proof. *Duvall v. Brenizer,* 818 S.W.2d 332, 336 (Mo.App. W.D.1991), citing *Martin v. O'Connor,* 406 S.W.2d 41, 43 (Mo.1966).

■ The record is replete with evidence of a confidential and fiduciary relationship between Decedent and Respondents. As detailed below, Decedent gave Respondents access to her safe deposit box, added their names to her checking account, allowed them to pay her bills, and allowed them to influence and change her financial arrangements. In Mary Manes' deposition testimony, she wholeheartedly agrees with the question of whether she thought that Decedent "had full trust and confidence in [Mary] and Cheryl in July when she started telling you these details about her financial situation?" Mary responds, "Oh, yeah. . . . My mom had full confidence in us." Mary goes on to twice respond in the affirmative to the question, "And she trusted you to help her change the basic set-up of how her financial arrangements with her husband were at that point?"

Respondents also clearly obtained a benefit from the trust amendment. Not only did they become recipients of almost all of the assets of the trust, but the amended trust also accelerated the time in which Respondents would receive their inherited property and increased the amount of assets in general they would receive by eliminating others as beneficiaries, most notably Appellant and Decedent's disabled son Daniel.

The record also contains additional evidence from which it can be inferred that Respondents exerted undue influence over Decedent in the amendment of her trust. Such additional evidence can be gleaned from an examination of the following relevant factors for ascertaining the existence of undue influence.

Factors sometimes used by the courts in determining whether undue influence has been exerted over a testator are set forth in *Disbrow v. Boehmer,* 711 S.W.2d 917, 925 (Mo.App. E.D.1986). These factors include (1) the mental and physical condition of the testator; (2) evidence of power and opportunity to influence the testator by the beneficiary; (3) whether the will makes an unnatural disposition of property; (4) whether the bequest constitutes a change from a former will; (5) the hostile feelings of the beneficiary toward an expected recipient; (6) remarks of the beneficiary derogatory of the contestant; and (7) actions of the beneficiary in discouraging others from visiting the testator. *Id.*

■ Decedent's mental and physical conditions were substantially compromised at the time the trust amendment was executed. She was suffering from colon cancer, for which she had recently had surgery. On August 28, 2004, Joann Dyroff

(Dyroff), the attorney that Respondents hired to draft the trust amendment,[2] received a telephone call from Respondents stating that they were concerned about Decedent's health and wanted the trust amendment revised and executed that day. When Decedent signed the trust amendment, her longtime friend Sharon Smith (Smith) was present. Smith stated that Decedent did not seem to know where she was or who Smith was. Smith testified that Decedent was extremely groggy, weak and not like herself; and Cheryl Kennedy had to spell out Decedent's last name to Decedent for Decedent to finish signing the document.

The record also demonstrates that Respondents had the power and opportunity to influence Decedent. Appellant stated that Decedent idolized Respondents. Mary Manes testified that Decedent had full trust and confidence in Respondents. Kennedy flew into town from Florida in July 2004 around the time Decedent became sick. Respondents and Decedent discussed her financial arrangements at this time, and Decedent gave them access to her safe deposit box to retrieve financial documents, including the original trust, the day after Kennedy arrived in town. Kennedy again flew into St. Louis from Florida in late August 2004. At this time, Decedent added Respondents' names to her checking account. On August 27, Kennedy told Dyroff she wanted the changes to the trust to be made as soon as possible. On August 28, the trust amendment was executed, in the presence of Respondents with Kennedy aiding Decedent's signing of her last name.

The trust amendment makes an unnatural disposition of property, in the sense that all of the changes benefited Respondents. The trust amendment constituted a change from the original trust, in that: (1) the trust amendment reduced the $10,000.00 bequest Decedent had provided to her disabled son, Daniel, to $5000.00; (2) Daniel was removed as a residual beneficiary of the trust, thus making Respondents the only two residual beneficiaries of the trust; (3) Appellant was removed entirely as a beneficiary and as successor trustee. The trust amendment made Respondents beneficiaries of nearly all of the trust assets. Appellant was allowed to occupy the property he and Decedent had been living in for only six months, and then he either had to purchase the property from Respondents, or get out. Previously, Decedent's trust had allowed Appellant to remain at the property for his lifetime.

The hostile feelings of Respondents toward Appellant are apparent from the record. In Mary Manes' affidavit, she blames Appellant for the suicide of her sister and clearly feels resentment toward Appellant for his longstanding extra-marital affair.

Respondents rely heavily on Appellant's purported admission in his deposition that it was Decedent's intention that Respondents have the two properties upon her death. Respondents maintain that this admission is crucial to Appellant's inability to prove undue influence because the crux of a claim of undue influence is that Respondents made Decedent make changes that did not comport with Decedent's intent.

When Appellant was asked at his deposition, "Did [Decedent] ever tell you that she wanted to give her daughters her property when she died?" he replied, "That was the agreement." Respondents argue that this

---

2. Proof that a beneficiary under a will—also in a relation of confidence with the testator—procured and paid the lawyer who drew the testament suffices to raise a presumption of undue influence for jury submission. *Estate of Stanley*, 655 S.W.2d 88, 90 (Mo.App. W.D. 1983).

answer constitutes an admission by Appellant that Decedent's intent was that Respondents inherit her property, and thus roundly defeats his claim that they exercised undue influence upon Decedent in getting her to change the disposition of the property from him to them, against her original intent.

However, in his response to Respondents' motion for summary judgment, Appellant explains his answer to mean that it was Decedent's intent that Respondents would inherit her property *after the death of the remaining spouse (Appellant) who was trustee under the original trust.* As such, we find Appellant's response sufficiently denies Respondents' assertions of undisputed fact in their motion for summary judgment.

In any event, we do not interpret Appellant's statement in the manner proposed by Respondents. We find that Appellant's answer to the question posed could be interpreted to mean that Decedent wanted her daughters eventually to have her property. This intent is not necessarily at odds with an intent to have Appellant have and live on the property upon her death. Furthermore, the trust amendment also accelerated the time in which Respondents were to receive this property, by eliminating the trust for Appellant during his lifetime, and increased the amounts Respondents would receive upon Decedent's death, by eliminating Daniel as a residual beneficiary. As such, the issue of Respondents' undue influence extends beyond Respondents' ultimate ownership of the property where Appellant was living at the time of Decedent's death.

### Lack of Mental Capacity

We also find evidence in the record, and in Appellant's response to the motion for summary judgment, of Decedent's alleged lack of mental capacity. As set out earlier in this opinion, Decedent's longtime friend Smith, who was present at Decedent's execution of the trust amendment, attests in her affidavit that Decedent did not seem to know where she was when she signed the trust amendment; and that she did not seem to recognize Smith. Smith also testified that Decedent was extremely groggy, weak, and not like herself, and that Cheryl Kennedy had to spell out Decedent's last name to Decedent for Decedent to finish signing the document. Peggy Blumer, Decedent's daughter-in-law, also testified by affidavit to Decedent's rapid decline in mental capacity from May 2004, until the day she signed the trust amendment in late August, attributing this to not only Decedent's diminishing health but also to the medication she was taking for pain management.

In support of their motion for summary judgment, Respondents included the affidavit of Dryoff, in which she states that Decedent knew what she was doing by signing the trust amendment, understood the effects the amendment would have, and wanted those results. Although Dryoff has in excess of twenty-five years of experience as an estate-planning attorney, such experience does not make her an expert on Decedent's mental state, and whether it was progressing downhill from its usual state in the time up to and including the execution of the trust amendment. Rather, it is the opinion of those people familiar with Decedent, with a history of friendship or familial relationship with Decedent that is indicative of Decedent's true mental state. Furthermore, Dryoff hardly knew Decedent, had never met her before the execution of the trust amendment, and cannot even remember what specific questions she asked Decedent or what answers Decedent gave. Dryoff even admitted that she could not testify as to Decedent's mental acuity at the time. Finally, even if Dryoff's testimony as to Decedent's mental

acuity was given weight equal to that of Decedent's friends and family, their conflicting testimony gives rise to a disputed issue of material fact as to Decedent's lack of mental capacity sufficient to defeat Respondents' motion for summary judgment.

*Conclusion*

Mindful that we review the record in the light most favorable to the party against whom judgment was entered, according that party the benefit of all reasonable inferences from the record, and summary judgment is rarely appropriate in cases involving proof of such elusive facts as intent, undue influence, and mental capacity, we find Respondents are not entitled to judgment as a matter of law in this case. Points I and II are granted. Point III is rendered moot by our resolution of Points I and II, and therefore will not be addressed. The trial court's grant of summary judgment in favor of Respondents is reversed and remanded for further proceedings consistent with this opinion.

MARY K. HOFF, P.J., and GEORGE W. DRAPER III, J., concur.