**RALSTON PURINA COMPANY, A Corporation, Plaintiff-Appellant,**

v.

**O. Q. KENNEDY and Mabel Kennedy, Defendant-Respondents.**

No. 7919.

Springfield Court of Appeals.

Missouri.

June 6, 1961.

John A. Casey, Poplar Bluff, for plaintiff-appellant.

Henson & Henson, Poplar Bluff, for defendants-respondents.

ELMO B. HUNTER, Special Judge.

Plaintiff, Ralston Purina Company, a corporation, sued the defendants O. Q. Kennedy and Mabel Kennedy, husband and wife, under a written contract involving a turkey crop production. Judgment was entered for defendants in the net amount of $2,999.41. Plaintiff has appealed.

Ralston Purina Company is a corporation engaged partly at least in the production of feeds, tonics and medicines for poultry and animals, including turkeys. By petition it alleged that on June 25, 1957, plaintiff and defendants entered into a signed agreement whereby plaintiff was to furnish feed, tonics, disinfectants and medicines to defendants for their use in caring for approximately 6,000 baby turkeys; that defendants agreed to pay for same on or before January 1, 1958; that plaintiff furnished such products in the total amount of $19,757.55; that on January 8, 1958, defendants paid on said account—$14,783.29 in cash (derived from sale of turkeys) and $415.28 in returned merchandise, leaving a balance due of $4,558.98, which sum had been demanded of defendants but was unpaid. Plaintiff's petition then concludes with a prayer for a $4,974.26 judgment—apparently including the $415.28 item of returned merchandise.

Attached to the petition is the signed agreement. The contract is captioned "Grower". It is a lengthy document and sets forth the agreements of each party in detail. Therein defendants are described as "Turkey Owner" and plaintiff as the "Manufacturer". The manufacturer agreed to furnish the feed and other products for which the owners agreed to execute their promissory notes when each delivery was made. The contract provided that "only officials of the Manufacturer's Finance Department * * * may waive, change or add to the terms".

By their answer defendants admitted that a payment of $14,783.29 had been made in cash and denied all other allegations. Defendants also filed a counterclaim, alleging that the written contract had been abandoned "by mutual consent of defendants herein and C. J. Clifft, agent of plaintiff" and that defendants and Clifft entered into an oral contract whereby plaintiff was to furnish defendants "with a herd of young turkeys", the necessary feed and medicines, and when the crop was sold, reimbursement was to be made for all expenses, and all of the profits paid to defendants for their services. Defendants alleged that plaintiff failed to promptly furnish proper medicines and as a result many birds died. Defendants further charged that plaintiff "without the consent and knowledge" of defendants, sold the turkeys for "less than the agreed price" all to defendants' damage in the sum of $7,500, for which they prayed judgment.

Plaintiff offered in evidence receipts signed by O. Q. Kennedy for the merchandise furnished. There is no real dispute on this point. Carl Clifft, the person with whom defendants dealt, testified that he resides in Paragould, Arkansas and had been a salesman of Ralston Purina products for seven years. He said he saw defendants sign the contract which was read to them at the time; that Mr. Kennedy in-

quired if they would be liable if the turkeys did not bring enough to pay the bills and he told them they would be liable. He stated that the turkeys were purchased from Paul's Hatchery, Berryvale, Arkansas, and that the purchase was made at the Kennedy farm with both Clifft and the man from the hatchery present. Clifft denied that any oral contract was made and said Kennedy sold the turkeys to one Oswald Franz, although Clifft located Franz as a prospective buyer. The check from the turkey sale was payable jointly to Kennedy and Ralston Purina. Kennedy endorsed it and Clifft sent the check to Ralston Purina. It was Clifft's belief that such amount ($14,783.29) represented the total receipts from the sale of the turkey crop except Mr. Kennedy told him that 100 or so had been sold "to a buyer up north and he had cashed the check and spent it". It was Clifft's testimony that he many times urged the defendants to move the turkeys to fresh ground; that he feared that unless this was done the flock would get sick, so he began supplying medicated feed. He said Kennedy called him at West Plains and said the turkeys were sick; that the next day he took one of the birds to the Purina laboratory in St. Louis where it was determined the turkey had erysipelas and that the whole flock was then vaccinated with penicillin.

At the time of the trial defendant O. Q. Kennedy was 64 years of age and resided on a farm near Hunter in Carter County, Missouri. He has been raising turkeys "off and on" for 27 years. He said he first met Clifft in the spring of 1957, and that when he signed the contract he thought it was so Ralston Purina could check his credit rating; that a few days later Clifft came back and they mutually agreed that Ralston Purina would "furnish the turkeys, the feed and medicines"—that Kennedy was to "raise the turkeys", furnish the feeders, water and ground, and receive all the profits above costs. Kennedy claimed he never bought the turkeys and when they were delivered did not even know from what hatchery they came. He testified that Clifft had agreed to debeak the gobblers but when he asked him to do this Clifft said that the medicine in the feed would keep them from fighting. However, he said 175 to 200 birds were lost as a result of fighting. Mr. Kennedy declared that when the turkeys grew to about four pounds in weight, they got sick; that he called Clifft, who came over and changed the feed; that the sickness continued; that he again called Clifft and was told he had the flu; that after ten days had passed, Clifft came with penicillin and hypodermic needles and the flock was vaccinated; that it was his estimate that about 1,020 turkeys died. When selling time came Kennedy said Mr. Clifft found a market with a Mr. Franz and told him the price would be—21½¢ per pound for the toms and 24½¢ per pound for the hens but that so far as he was able to determine from the settlement check and scale tickets the turkeys were sold for 19¢ per pound straight. He declared that he had endorsed the check "under protest". On cross-examination he admitted that he had read the contract before signing it and understood its terms. Mr. and Mrs. Kennedy signed promissory notes for the feed as it was delivered and a note in the sum of $4,020, payable to Southern Turkey Hatchery, West Plains. This was the purchase price for the young turkeys.

The Court's instruction to the jury required a finding (1) on plaintiff's petition and (2) on defendants' counterclaim. Nevertheless, the jury, after having deliberated 87 minutes, returned the following verdict which was signed by 10 jurors:

"We, the jury in the above entitled cause, find the issues herein for the defendants and against the plaintiff on the defendants' counterclaim and award the defendants, O. Q. Kennedy and Mabel Kennedy, the sum of $3,-000." The trial court thereupon orally told the jury that two issues were involved in the case, advised that it had resolved the issue as to the counterclaim and asked the jury to return to

the jury room and resolve the issue as to plaintiff's petition. Five minutes later the jury was back with a verdict in words and figures as follows: "We, the jury in the above entitled cause, find the issues herein for the defendants on the plaintiff's petition. $4500.-59

/s/ Will Whitwell
Foreman

"We, the jury in the above entitled cause, find the issues herein for the defendants and against the plaintiff on the defendants' counter-claim and award the defendants, O. Q. Kennedy and Mabel Kennedy, the sum of $7500.-00." (Signed by ten jurors).

The figure $4,500.59, written on the verdict is neither the amount claimed nor the amount proved by plaintiff. Prior to entry of judgment on the verdict, counsel for each party made an oral motion:

"Mr. Henson: (One of counsel for defendants) I move the Court to accept that verdict as the obvious intent of the Jury, and it is apparent upon the face of it what they meant, and to enter a judgment, verdict and judgment for the defendants on plaintiff's petition, and for the defendants on their counter-claim, and against the plaintiff on their petition, in the sum of $3000.00.

"Mr. Casey: (for plaintiff) On behalf of the plaintiff, we wish to request that the Court declare a mistrial, and discharge the Jury."

The trial court overruled the motion for mistrial, sustained defendants' motion and entered a judgment which reads: "Wherefore, it is considered, adjudged and ordered by the Court upon the Verdicts of the Jury herein, that judgment be for the defendants on plaintiff's petition; and that judgment be for the defendants and against the plaintiff on Defendants' Counter-claim in the sum of Two Thousand Nine Hundred Ninety Nine Dollars and Forty One Cents ($2,-999.41), and as aforesaid assessed by the jury".

Plaintiff's first assignment of error is that the judgment is void and unenforceable because the verdict is ambiguous and so unclear as to make it impossible to determine what the jury intended.

In Powell v. Bierman, Mo.App., 22 S.W. 2d 854, 855, the verdict was for plaintiff in the amount of $5,000 on a promissory note and against defendant on his counterclaims, but silent as to allowance of interest. The trial court entered judgment for $5,000, plus $750 interest. On appeal the judgment was reversed and the cause remanded. The court said: "It has been held repeatedly that the right of a court to amend the verdict after the discharge of the jury is limited to matters of form, or clerical errors clearly made manifest by the record, but never to matters of substance, required to be passed on by the jury, which in their nature are essential to the determination of the case and subject to dispute. If, therefore, any correction of a verdict is to be made, except as to matters of form, it must be done by the jury before their discharge".

Kaimann v. Kaimann Bros. Inc., Mo.App., 182 S.W.2d 458, 462, is an unlawful detainer action. The verdict found the value of the monthly rents and profits to be $2,760, when the complaint had placed a limitation of $460 upon this feature. After the jury was discharged, two jurors filed affidavits which purported to show the jury intended to allow rents and profits of $460 and damages of $2,760. The Court entered judgment for double of both of these amounts as the statute required. The appellate court reversed, remanded and said: "It is settled law that the court's right to amend a verdict after the discharge of the jury is limited to matters of form or clerical errors manifested by the record, and never extends to matters of substance passed on by the jury and essential to the determination of the case. Meffert v. Lawson, 315 Mo. 1091, 287 S.W. 610; Powell v. Bierman, Mo.App., 22 S.W. 2d 854. Where the jury returns a verdict

**466**

containing a patent ambiguity or defect, *it is the duty of the court, at the time the verdict is read, to call the jury's attention to such ambiguity or defect so that the jury itself may correct its verdict before it is received and judgment entered thereon.* Glaves v. Old Gem Catering Co., Mo.App., 18 S.W.2d 564; Turley v. National Ammonia Co., Mo.App., 299 S.W. 53. But as pointed out, once the verdict is received and the jury discharged, it is only informalities, and not material matters, that the court will have the power to amend, since otherwise the court would be put in the position of substituting its own findings for those of the jury, and would thereby trespass upon the latter's special province as the body constituted to try the facts." (Emphasis added.)

Blackman v. Botsch, Mo.App., 281 S.W. 2d 532, 535, is a personal injury automobile collision case with a counterclaim by the defendant. The jury first returned a nine man verdict for plaintiff on his petition for $5,000, but did not return a verdict as to the counterclaim. The Court told the jury it was their duty to return a verdict on the counterclaim. The jury thereupon returned a twelve man verdict for defendant on the counterclaim and assessed his damages at $500. The Court then informed the jury that the two verdicts were unacceptable because they were inconsistent. The jury's third effort produced a verdict for plaintiff on the petition for $5,000 and for plaintiff on defendant's counterclaim. This case and the discussion in the opinion demonstrates the power and the responsibility resting with the trial judge to control the verdict, making sure it is responsive and decisive as to all issues submitted. But once the verdict is accepted and the jury is discharged, the Court can neither enlarge nor restrict, nor even interpret the verdict except as the meaning clearly appears. On page 535 of the opinion the Court said: "The jury, under direction of the court, remains in control of the verdict until it is announced and recorded, Hary v. Speer, 120 Mo.App. 556, 97 S.W. 228, and see cases cited below, and

the court has the inherent power and the duty to require that verdicts which are inconsistent (as in this instance) or which are defective be corrected before they are finally recorded and made a part of the judgment. 89 C.J.S. Trial, § 512, page 192;".

On the question of certainty and definiteness of a verdict we find this statement in 89 C.J.S. Trial § 496, pp. 157, 158: "However, the verdict of the jury, to serve as a basis for a judgment, should be clear, intelligible, consistent, and certain; and it should import a definite meaning free from ambiguity and should show just what the jury intended".

The first finding or verdict which the jury returned was simply a finding for defendants on their counterclaim and in the amount of $3,000, with no finding on plaintiff's petition. This first verdict is not the one upon which judgment was entered (and we think the Court properly requested the jury to return a verdict on both the petition and the counterclaim) nor is it the verdict before us for review.

Defendants have urgently invited our attention to McIlvain v. Kavorinos et al., Mo.App., 212 S.W.2d 85, wherein a judgment entered upon a verdict, alleged to be ambiguous and insufficient, was upheld. That cause was an action in unlawful detainer. The verdict fixed the value of the monthly rents and profits at $105. The Court computed the amount of the judgment on the verdict at $105 per month from the undisputed date of unlawful withholding to the date of verdict, and then doubled as required by statute. We do not believe the holding in that case rules our case.

It is our opinion that the verdict here is vague, is ambiguous and will not support the judgment entered thereon. The judgment, as entered, is for $2,999.41. Nowhere in the verdict is this figure even mentioned. The only method by which such a figure could be reached under the verdict would be to interpret it as a finding for plaintiff on

its petition for $4,500.59 and then deduct this amount from the $7,500 finding for defendants on their counterclaim. The verdict unequivocally declares a finding for defendants on plaintiff's petition and a further finding for defendants on their counterclaim in the sum of $7,500. Absent any extraneous interpretation this verdict would seem to require a judgment for defendants on plaintiff's petition and a judgment for defendants and against plaintiff on the defendants' counterclaim in the amount of $7,500. The Court (and such was the import of defendants' motion) apparently treated the first part of the verdict as a finding for plaintiff in the sum of $4,500.49 and deducted this amount from the $7,500 finding for defendants on their counterclaim, leaving a net recovery for defendants of $2,999.41.

Defendants on appeal contend that such a result could logically be reached by considering the jury's first verdict which was in favor of the defendants in the amount of $3,000. If we indulge in speculation, this may have been the jury's intention but it is most difficult to reach that conclusion from an examination of the verdict. We cannot reach any such conclusion nor arrive at any such judgment from a reading and study of the verdict, and to enter judgment as the trial court did is to amend the verdict after the discharge of the jury, to change and state a matter of substance required to be passed on by the jury. The judgment must for this reason be reversed and the cause remanded for a new trial.

This being the result it is unnecessary to consider the other assignments of error. In view of the enlightenment contained in the briefs most of them will likely not recur, at least in the same way, as they arose here.

The judgment is reversed and the cause remanded.

STONE, P. J., and McDOWELL, J., concur.

RUARK, J., not participating.