Eileen M. DISBROW,
Plaintiff-Respondent,

v.

Edwin R. BOEHMER and Elma Ferne Boehmer, Defendants-Appellants.

No. 49863.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 13, 1986.

Motion for Rehearing and/or Transfer Denied June 10, 1986.

Application to Transfer Denied July 15, 1986.

Kenneth S. Lay and Eugene E. Coon, Jr., Clayton, for defendants-appellants.

James J. Hennelly and H. William Hinderer, III, St. Louis, for plaintiff-respondent.

PUDLOWSKI, Judge.

Eileen M. Disbrow, respondent, brought this action to set aside the last will and testament of her mother, Ruth C. Boehmer, testatrix, which was executed on August 27, 1979. The respondent also sought to set aside the testatrix's earlier last will and testament and codicil dated September 12, 1978, and November 17, 1978, respectively. Her action was premised on the grounds that the testatrix lacked testamentary capacity because she was of unsound mind and that the execution of these documents was the result of the undue influence exerted by Edwin R. and Elma Ferne Boehmer, appellants. The trial court entered judgment on the jury's verdicts that none of these documents were the last will and testament of the testatrix. We affirm.

The testatrix had two children, the respondent and Mr. Boehmer. At trial, the respondent related that toward the end of the period where the testatrix lived alone in her apartment on Bates Avenue in St. Louis, she and her daughter had seen the testatrix catch potholders and kitchen towels on fire while cooking. The respondent further testified that the testatrix would even burn herself. During this period, the respondent found the testatrix more confused in general. She stated that the testatrix would forget to take her sleeping pills and blood pressure medicine. The testatrix even called the respondent by the wrong name.

Indeed, the testatrix's personal physician, Dr. Horst Zekert, had noted the testatrix's senility in his medical records as early as 1974. In his videotaped deposition which was played for the jury, Dr. Zekert testified that during 1978 and 1979 the testatrix was in the advanced stages of arteriosclerosis. He stated that the arteriosclerosis caused the testatrix to suffer from senility.

Because of the testatrix's condition, the respondent thought the family should move the testatrix to a retirement home. Thereafter, the respondent took the testatrix to see the St. Louis Hills Retirement Center. The testatrix liked the facility and on May 31, 1978, the respondent, her boyfriend, Tom Terry, and her son-in-law, Richard Steed, moved the testatrix to the center.

Before the testatrix moved, she had a safe deposit box at Southern Commercial Bank. The testatrix, the respondent, and Mr. Boehmer were the names listed on the box. After the move, the safe deposit box at Southern was closed and a new one was

opened at Mr. Boehmer's bank. Only Mr. Boehmer and the testatrix were listed.

Following the move, most of the testatrix's furniture was stored at the respondent's daughter's home on the contingency that the testatrix would decide to leave the St. Louis Hills Retirement Center where her apartment was furnished. In July 1978, the respondent's daughter phoned the respondent to tell her that Edwin Boehmer had come over to move the testatrix's furniture in order to sell the items at a garage sale. The respondent then left for her daughter's house.

When she arrived, the respondent, her daughter, and Edwin Boehmer went to the basement where an argument began between the respondent and Mr. Boehmer over the proposed garage sale. The testatrix was also present albeit upstairs watching her great-granddaughter. The respondent felt that her brother, Mr. Boehmer, had taken advantage of her by letting her take the testatrix shopping all the time and by letting her move the testatrix and her furniture. The respondent further told her brother that he would have to start helping too. She also stated that she was not going to continue to run all the errands in the future.

The respondent testified that Mr. Boehmer responded by asking her, "How would [she] like it if mom changed her will?" He also asked the respondent's daughter, "How would you like it if grandma changed her will?" Afterward, everyone returned upstairs. There, the respondent said good-bye to the testatrix and left. The respondent testified that the testatrix acted as though nothing was wrong. During the argument, the testatrix who was hard of hearing was upstairs.

The appellant's version of this incident differs. Mr. Boehmer testified that the respondent asked the testatrix for a list of her assets and for a key to her safe deposit box. The testatrix refused and, according to Mr. Boehmer, the respondent exclaimed that she would not see the testatrix until the decedent was in the grave or coffin.

In July 1978, Mrs. Boehmer began visiting the testatrix more frequently. They went out many times together including trips to get the testatrix's hearing aid repaired and to purchase a new hearing aid. Mrs. Boehmer testified that the testatrix "[s]tarted telling me in the summer that I was more than a daughter-in-law. She was going to call me her daughter because I did so many things for her."

In August 1978, medical records from the retirement home reflected the purported estrangement between the respondent and the testatrix. On August 24, 1978, the records state that on August 23, 1978, the testatrix "went out to dinner with her son." On August 31, 1978, her next doctor visit, the testatrix told the doctor that the respondent was "creating problems in the family." During this time, the respondent continued to see her mother regularly although she had no further contact with her brother.

On September 12, 1978, the testatrix executed a new will. Mr. Boehmer testified that the testatrix sought to change the will in August 1978. He directed the attorney, Mr. Kearns, to call him rather than the testatrix because her hearing problem would make it difficult for the attorney to talk to her. Her prior will divided the estate equally between her two children. The testatrix's new will left seventy-five percent of her estate to Mr. Boehmer and twenty-five percent to the respondent.

On October 11, 1978, Mr. Boehmer typed and sent a letter, which was signed by the testatrix, to the owner of the retirement home, stating the following:

Please be advised that if it is necessary in the future to have any communication about myself and you do not wish to contact me personally, then I wish you to address your message to my son, Edwin R. Boehmer, or his wife, Ferne. His address is as follows: 10744 Lavinia Drive, St. Louis, Missouri, 63123. His phone number is: 843-6357.

He is in charge of my financial and certain other matters and is the person to

be contacted. Thank you for your cooperation.

Thereafter, in November 1978, the testatrix executed a codicil to her will of September 12, 1978. In the codicil, the testatrix left all her personal property to Mrs. Boehmer. In December 1978, Mr. Boehmer typed six $3000.00 checks, which the testatrix signed on December 15, 1978, payable to himself, his wife, and his four children. Later, Mr. Boehmer typed six additional $3000.00 checks payable to the same people. The testatrix signed these checks on January 2, 1979. He also typed Christmas checks for himself, his wife, and his children. The testatrix wrote a $25.00 Christmas check to Diane Disbrow, the respondent's daughter.

Throughout this time period, the testatrix lived at the St. Louis Hills Retirement Center. While at the center, the testatrix told a social worker on April 24, 1979, that she loved her two children "equally." The testatrix also told the social worker that her son, Mr. Boehmer, had been married twelve years when he actually had been married thirty-three years. In addition, the testatrix stated on July 4, 1979, that her son would soon be opening a Velvet Freeze store when he had already opened the store in February.

Moreover, during her residence at the center, the testatrix would get up at night and walk the halls. She was bathed by aides. In addition, Mr. Boehmer did not want the testatrix to take her prescribed sleeping pills. As a result, the testatrix was evicted from the center on July 31, 1979.

In August 1979, the respondent went to the center to visit the testatrix. She had last seen her in July for the decedent's birthday. At the center, the respondent was told that Mr. Boehmer had moved the testatrix. Thereafter, the respondent phoned the Boehmers but each time she called, Mrs. Boehmer would answer and then hang up. The respondent never saw her mother alive again although she concluded that the testatrix was living with the Boehmers.

In August 1979, Mr. and Mrs. Boehmer moved the testatrix into a mobile home located in a trailer park in Jefferson County. The home had an unlisted phone number and neither the Boehmers nor the testatrix left the new address at the center. Because the home was close to the Boehmers' Velvet Freeze, Mrs. Boehmer saw the testatrix everyday and made her lunch. It was also during August 1979 that the testatrix executed her last will which left ninety-five percent of her estate to her son, Mr. Boehmer.

The testatrix remained in the mobile home until February 1982 when she moved in with Hinda Hunter who cared for several other elderly women. While with Mrs. Hunter, the testatrix told her that the respondent lived in California or Florida. Later, the testatrix fell and broke her hip. She was hospitalized at St. Anthony's Medical Center until August 15, 1982, when she died.

Following the testatrix's death, Mr. Boehmer called the respondent. After the testatrix's funeral, he showed the respondent the 1979 will and a paper wherein the testatrix stated that she had changed her will because the respondent did not want to see her again until she was in her coffin. Mr. Boehmer denied that such a paper existed.

Thereafter, the respondent filed her action to set aside the testatrix's two wills and codicil. Following three days of trial, the jury returned three verdicts that none of these documents were the last will and testament of the decedent: (1) Verdict A nullifying the September 12, 1978 will; (2) Verdict B nullifying the November 17, 1978 codicil; and (3) Verdict C nullifying the August 27, 1979 will.

■ On appeal, the Boehmers raise fifteen issues. We first address Points VII, VIII, and IX which concern the testimony of the respondent's expert, Dr. Horst Zekert. In Point VII, the Boehmers contend the trial court erred in admitting into evidence the videotaped deposition of Dr. Ze-

kert because no foundation for its use and admission was laid. We disagree.

In *State ex rel. Lucas v. Moss*, 498 S.W.2d 289, 291–292 (Mo. banc 1973), the Missouri Supreme Court first authorized the use of videotape at trial to present the deposed testimony of a witness to the jury. *See also* Cox, *Video Tape and Missouri Civil Trials*, 30 Mo.Bar J. 216 (1974); Annot., 66 A.L.R.3d 637 (1975). Following the Supreme Court's decision in *Moss*, Rule 57.-03(c) concerning videotaped depositions was enacted. Rule 57.03(c) provides the following:

Depositions may be recorded by the use of video tape or similar methods. The recording of the deposition by video tape shall be in addition to a usual recording and transcription method unless the parties otherwise agree:

(1) If the deposition is to be recorded by video tape every notice or subpoena for the taking of the deposition shall state that it is to be video taped and shall state the name, address and employer of the recording technician. If a party upon whom notice for the taking of a deposition has been served desires to have the testimony additionally recorded by other than stenographic means, he shall serve notice on the opposing party and the witness that the proceedings are to be video taped. Such notice must be served not less than 3 days prior to the date designated in the original notice for the taking of the depositions and shall state the name, address and employer of the recording technician.

(2) Where the deposition has been recorded only by video tape and if the witness and parties do not waive signature, a written transcription of the audio shall be prepared to be submitted to the witness for signature as provided in Rule 56.03(f).

(3) The witness being deposed shall be sworn as a witness on camera by an authorized person.

(4) More than one camera may be used, either in sequence or simultaneously.

(5) The attorney for the party requesting the video taping of the deposition shall take custody of and be responsible for the safeguarding of the video tape and shall, upon request, permit the viewing thereof by the opposing party and if requested, shall provide a copy of the video tape at the cost of the requesting party.

(6) Unless otherwise stipulated to by the parties, the expense of video taping is to be borne by the party utilizing it and shall not be taxed as costs.

No further procedure or foundation for the use of videotaped depositions is specified. This accords with the Supreme Court's holding in *Moss* that the trial court should make case-by-case determinations whether or not the videotape is an accurate representation of the deposed witness' testimony. 498 S.W.2d at 292.

In the present case, we defer to the trial court's implicit finding that the videotape was an accurate representation of the deposed witness' testimony. In no way were the Boehmers prejudiced by the absence of a foundation. Both Mr. Boehmer and his attorney were present at Dr. Zekert's deposition. A court reporter who prepared a typed transcript of Dr. Zekert's testimony was also present. Indeed, the Boehmers possessed a copy of the transcript and never cited to the trial court nor now allege any deficiency or inaccuracy in the videotape.

In Points VIII and IX, the Boehmers contend the trial court erroneously admitted the testimony of Dr. Zekert because it was incompetent, irrelevant, and highly prejudicial for the following reasons: (1) Dr. Zekert had no specific or direct knowledge that the testatrix had any symptoms of senility; (2) his testimony was non-responsive; and (3) some of his testimony was speculative. We disagree.

The qualification of a physician as an expert largely rests within the discretion of the trial court and its ruling is not to be

overturned unless such discretion has been abused. *Christian v. Jeter*, 287 S.W.2d 768, 771 (Mo.1956). Likewise, the trial court is vested with substantial discretion in determining whether to accept or reject the testimony and opinions of experts. *Ponciroli v. Wyrick*, 573 S.W.2d 731, 735 (Mo.App.1978).

■ Moreover, a practicing physician, although not a psychiatrist, is qualified to give an opinion as to the mental condition of the person he has examined and observed. *In re Richard*, 655 S.W.2d 110, 113 (Mo.App.1983). The expert's medical opinion relating to the mental condition or capacity of a person need not be the answer to a hypothetical question but may be premised upon the expert's observations. *Ritterbusch v. Speaks*, 602 S.W.2d 937, 940 (Mo.App.1980). In addition, medical experts are entitled to base their opinions upon the teachings of medical science and are not limited to expressing opinions only as to subjects which they are familiar through their own observation and experience. *Boring v. Kansas City Life Insurance Co.*, 274 S.W.2d 233, 238 (Mo.1955).

■ Under Points VIII and IX, the Boehmers challenge Dr. Zekert's testimony because he had no specific or direct knowledge that the testatrix had the symptoms of senility. In his deposition, Dr. Zekert testified generally from his records and when he had no present recollection or refreshed recollection, he so indicated. Dr. Zekert first treated the testatrix on August 14, 1973, and continued to treat her until June 21, 1979. Dr. Zekert testified that he made notations in his records that the testatrix was senile on February 15, 1974; quite senile on November 29, 1974; very senile on June 23, 1975, and July 30, 1976; senile on December 16, 1977; and intermittently confused on June 21, 1979. Dr. Zekert further testified that the decedent suffered from arteriosclerosis in 1974 and from the advanced stages of arteriosclerosis in 1978 and 1979. He explained that the arteriosclerosis caused the testatrix to suffer from senility. In light of these facts, Dr. Zekert's lack of specific recollection of the testatrix's specific symptoms of senility merely went to the weight of his testimony and not to its admissibility.

■ The Boehmers also challenge one of Dr. Zekert's answers as nonresponsive. The respondent's counsel asked the following question during the deposition:

Doctor, based on your observations of [the testatrix] from 1974 on through 1978 and 1979, and based upon your comments in your records there, did you form some opinion as to her mental condition in terms of how that would be diagnosed medically?

In response, Dr. Zekert testified as follows:

Well, I'm sure—I consider this to be due to arteriosclerosis, generalized arteriosclerosis, hardening of the arteries. She had the hypertension. I would say in '74—at that time she was 82—she definitely had signs of being forgetful, senile, and confused at times.

Although counsel's question was directed toward either a "yes" or "no" answer, Dr. Zekert's answer was not truly unresponsive to the question. By responding as he did, Dr. Zekert implicitly answered "yes" to the question whether he had formed an opinion as to the testatrix's mental condition and then went on to answer what would have been the next logical question in counsel's examination, *i.e.*, what Dr. Zekert's actual opinion was. Under these circumstances, the trial court did not abuse its discretion in permitting the questioned testimony.

The Boehmers further argue that the trial court erred in admitting Dr. Zekert's testimony regarding the symptoms generally exhibited by a person who has arteriosclerosis. The challenged testimony involved questions whether arteriosclerosis has any effect on mental faculties and whether individuals in the advanced stages of the disease are susceptible to the suggestions of others. Dr. Zekert responded affirmatively to each question. The Boehmers contend the evidence was irrelevant and speculative because none of the evidence made it more probable than not that

the testatrix lacked testamentary capacity. We disagree.

■ The trial court has broad discretion to accept or reject expert testimony. *Ponciroli*, 573 S.W.2d at 735. In the present case, following his testimony regarding the general symptoms of arteriosclerosis, Dr. Zekert testified how the disease affected the testatrix. He explained that the testatrix was confused as to dates, recent events, and what medication to take and how to take it. Dr. Zekert further testified that the testatrix was forgetful and unaware of many things. Likewise, following his testimony that a person suffering from arteriosclerosis might be subject to suggestion, Dr. Zekert answered affirmatively that his testimony would relate to the testatrix if she was in the advanced stages of arteriosclerosis in 1978 and 1979. Under these circumstances, we find no abuse of discretion.

We next address the issues raised in Points I, II, and III of the Boehmers' brief. In these points, the Boehmers allege that Verdicts A, B, and C are against the law and the evidence because there was no substantial evidence that the testatrix was not of a sound and disposing mind and memory at the time each of the documents in question was executed. We disagree.

On appeal, we can overturn a jury's verdict only if there is no substantial evidence to support it. *Elliott v. St. Louis Southwestern Railway Co.*, 487 S.W.2d 7, 14 (Mo.1972). We defer to the jury regarding the weight and credibility of the evidence. *Lewis v. McCullough*, 413 S.W.2d 499, 505 (Mo.1967). In the present case, we accept the respondent's evidence as true, disregard the Boehmers' evidence unless it aids the respondent, and give the respondent the benefit of every favorable inference legitimately drawn from the evidence. *Switzer v. Switzer*, 373 S.W.2d 930, 938 (Mo.1964).

■ In Missouri, a testator is found to have a sound and disposing mind and memory when he has mind enough to understand the ordinary affairs of life, the na-

ture and extent of his property, the persons who are the natural objects of his bounty, and to weigh and appreciate his natural obligations to those persons. *Lewis*, 413 S.W.2d at 505. *See also*, MAI 15.01. Proof of testamentary capacity at the very moment that a will is executed need not be made. *Proffer v. Proffer*, 342 Mo. 184, 114 S.W.2d 1035, 1040 (1938). Indeed, evidence of occurrences and circumstances prior to and closely approaching the time of the execution of the will, and shortly subsequent thereto, which tends to shed light on the issue of testamentary capacity and tends to show the condition of testator's mind at the time of the execution of the will, is competent. *Id.*

Applying these standards to the facts of the present case in the light most favorable to the respondent, we hold that there was substantial evidence to support Verdicts A, B, and C that the testatrix was not of sound and disposing mind and memory at the times the contested documents were executed.

■ First, there was substantial evidence that the testatrix was unable to understand the ordinary affairs of life. Although sickness, old age, and mere eccentricities are insufficient to nullify a will on the ground of mental incapacity, each may be taken into consideration with other facts in determining testamentary capacity. *Proffer*, 114 S.W.2d at 1040. In the present case, the testatrix would fail to recognize the respondent, would call her by the wrong name, and phone her in the middle of the night. The testatrix would also forget to take her medicine, would burn herself while cooking, and wouldn't change her clothes when dirty. Moreover, at the St. Louis Hills Retirement Center, the testatrix would lose her keys and roam the halls at night. On March 13, 1979, the testatrix told a social worker that her son was married for twelve years when he was married for thirty-three.

Second, there was substantial evidence that the testatrix did not understand the nature and extent of her property. In early 1979, she completed and filed her 1978

tax return. In her return, the testatrix failed to report $6542.00 of income, which was over 50% of her total income. In addition, all the testatrix's bank statements and dividends were mailed to Mr. Boehmer's house. Mr. Boehmer was the one who paid the testatrix's bills.

Finally, there was substantial evidence to submit to the jury the issue of the testatrix's mental capacity. In *Gee v. Bess*, 176 S.W.2d 516, 522 (Mo.App.1944), the court held there was sufficient evidence to make a jury question of the testator's mental capacity where a physician testified that an eighty-year old testator for several years prior to the execution of a will suffered from senile dementia, psychosis of senility, arteriosclerosis, and was of an unsound mind. Likewise, in the present case, Dr. Zekert testified that the testatrix was suffering from the advanced stages of arteriosclerosis. Dr. Zekert further related that as early as 1974, he had noted the testatrix's senility in his records.

We next address Points IV, V, VI, XI, XII, XIII, and XIV raised by the Boehmers on appeal. We address these points as a whole because they entail a substantial overlap of law and fact. In Points IV, V, and VI, the Boehmers contend that Verdicts A, B, and C are against the law and the evidence because there was no substantial evidence that the Boehmers had exerted any undue influence over the testatrix at the time the challenged documents were executed. Point XI posits the Boehmers' contention that the trial court erred in refusing to grant Mrs. Boehmer's motion for a directed verdict because no evidence supported the allegation that any undue influence was the result of Mrs. Boehmer's actions. In Points XII, XIII, and XIV, the Boehmers argue that the trial court erred in giving Instructions 10, 14, and 18 to the jury because there was no evidence to substantiate that Mrs. Boehmer exerted any undue influence over the testatrix at the time of the execution of the documents in question. We disagree.

 A presumption of undue influence arises if: (1) a confidential or fiduci-

ary relationship existed between the testator and a beneficiary; (2) the beneficiary has been given a substantial benefit by the will; and (3) the beneficiary caused or assisted in causing the execution of the will. *Kaiser v. Pearl*, 670 S.W.2d 915, 918 (Mo. App.1984). When supported by probative evidence, this presumption makes a prima facie case which does not disappear upon the introduction of rebutting evidence and raises an issue for the jury. *Carroll v. Knott*, 637 S.W.2d 368, 370 (Mo.App.1982). In addition, the courts recognize several other factors in determining whether undue influence has been exerted over the testator. These factors include (1) the mental and physical condition of the testator; (2) evidence of power and opportunity to influence the testator by the beneficiary; (3) whether the will makes an unnatural disposition of property; (4) whether the bequest constitutes a change from a former will; (5) the hostile feelings of the beneficiary toward an expected recipient; (6) remarks of the beneficiary derogatory of the contestant; and (7) actions of the beneficiary in discouraging visits by others. *Id.* at 371.

 In the present case, the facts clearly create a presumption that Mr. Boehmer exerted undue influence over the testatrix. First, there was a confidential or fiduciary relationship between the testatrix and Mr. Boehmer. Such a relationship exists when the decedent relies upon and trusts another to handle his property and business affairs. *Metter v. Janssen*, 498 S.W.2d 581, 585 (Mo.App.1973). The facts sub judice reveal that Mr. Boehmer handled the testatrix's financial affairs shortly before she moved from her apartment on Bates Avenue to the St. Louis Hills Retirement Center in May 1978. Indeed, in an interrogatory answer, Mr. Boehmer admitted that he kept and maintained the testatrix's records, including depositing her checks and paying her bills, from January 1978 to the testatrix's death on August 15, 1982.

Second, Mr. Boehmer was a substantial beneficiary under the contested wills and codicil. Mr. Boehmer was to receive seven-

ty-five percent of the testatrix's estate under the will of September 12, 1978, seventy-five percent of the estate exclusive of personal property under the codicil of November 17, 1978, and ninety-five percent of the estate exclusive of personal property under the will of August 27, 1979.

Last, Mr. Boehmer also caused or assisted in causing the execution of the challenged instruments. Mr. Boehmer made all the arrangements for the testatrix to change her will. He found an attorney, made the appointments, and drove the testatrix to the attorney's office. In addition, Mr. Boehmer had the attorney send the copies of the contested documents to his home for the testatrix to review rather than directly to her. He further told the attorney to call him because the testatrix had a hearing problem which would make it difficult for him to talk to her.

 Moreover, active procurement in the execution of a will may be inferred from the power of the fiduciary to influence the maker of a will, the opportunity to do so, the unnatural disposition of the property, and the change from the prior disposition. *Dobbins v. Hupp*, 562 S.W.2d 736, 741 (Mo.App.1978). In the present case, Mr. Boehmer took the testatrix out to dinner on August 23, 1978. On August 31, 1978, the testatrix told a doctor at the St. Louis Hills Retirement Center that the respondent was causing trouble in the family. Twelve days later the first contested will which left seventy-five percent of the testatrix's estate to Mr. Boehmer was executed. Similarly, the will of August 27, 1979, which left ninety-five percent of the testatrix's estate to Mr. Boehmer was executed less than a month after Mr. Boehmer moved the testatrix to a mobile home in Jefferson County. No forwarding address was given and the mobile home had an unlisted telephone number. Certainly, these facts together with those establishing a fiduciary relationship and a substantial benefaction justified the trial court's action in submitting the issue of undue influence on the part of Mr. Boehmer to the jury.

Likewise, the evidence justified the trial court's denial of Mrs. Boehmer's motion for a directed verdict and its submission to the jury of the issue whether Mrs. Boehmer exerted undue influence over the testatrix. In the case sub judice, the presumption of undue influence also arose against Mrs. Boehmer. Like her husband, Mrs. Boehmer was in a confidential or fiduciary relationship with the testatrix. The term "fiduciary or confidential" within the meaning of the presumption is not used in its strict, formal sense but is equivalent to the confidential relationship between two persons where one trusts and relies on the other. *Salisbury v. Gardner*, 515 S.W.2d 881, 884–885 (Mo.App.1974). In the instant case, Mrs. Boehmer began to see the testatrix more frequently in July 1978. Indeed, she helped the testatrix to such an extent that the testatrix began calling Mrs. Boehmer her daughter. Certainly, a relationship of trust and reliance existed.

Mrs. Boehmer was also a substantial beneficiary under the challenged wills and codicil. Under the will of September 12, 1978, Mrs. Boehmer would have benefited indirectly from Mr. Boehmer's interest in seventy-five percent of the testatrix's estate. Under the codicil of November 17, 1978, and the will of August 27, 1979, Mrs. Boehmer's benefits were direct, *i.e.*, she would receive all of the testatrix's personal property.

 There was also substantial evidence from which the jury could infer that Mrs. Boehmer was involved in the procurement of the challenged wills and codicil. Involvement in the procurement of a will may be inferred from circumstantial evidence. *Dobbins*, 562 S.W.2d at 741. In addition, once a confidential relationship and benefaction to the fiduciary is established, the courts take a very liberal attitude on the quantum of proof necessary to establish that the fiduciary was actively concerned in some way which caused or contributed to the execution of the will. *Carroll*, 637 S.W.2d at 371. In the present case, Mrs. Boehmer increased her visits to the testatrix less than two months before

the execution of the first challenged will. Her husband made all the arrangements for the testatrix to meet with an attorney to execute the contested documents. In addition, when the testatrix resided in the mobile home in Jefferson County, Mrs. Boehmer had further opportunity to exercise undue influence because she saw the testatrix almost everyday. Indeed, the second will was executed less than a month after Mr. Boehmer moved the testatrix from the St. Louis Hills Retirement Center without informing the respondent or leaving a forwarding address. When the respondent twice phoned the Boehmers to discover the whereabouts of the testatrix, Mrs. Boehmer hung up on both occasions. Under these circumstances, there was substantial evidence to submit the issue of undue influence on the part of Mrs. Boehmer to the jury.

■ We next address Point X raised by the Boehmers. In this point, the Boehmers contend the trial court erred in not granting a mistrial when the court repeated an answer during the playing of Dr. Zekert's videotaped deposition. We disagree.

The Boehmers' attorney made numerous objections in camera to Dr. Zekert's videotaped deposition. Some of these objections were sustained and where they were sustained, the videotape technician was required to turn off the audio while the tape was being played for the jury. One such objection came after the following question and answer:

> Question: And would that testimony of yours relate to [the testatrix] if she was in the advanced stages of arteriosclerosis in 1978 and 1979?

> Answer: Yes.

After this question and answer was played, the trial court interrupted and stated: "I don't know whether it was heard or not but the answer was 'yes.'"

Following the playing of the videotape, the Boehmers' attorney motioned for a mistrial in camera. The trial court denied the motion and made the following record:

Being as how I'm thrust into the middle of this thing, let me tell you why I did it on this record.

The technician hit a button, and my impression at the time was that he cut the answer off to the point that the jury may not have understood the answer. In fairness, I announced what the answer was from the transcript. All I did was share the answer that I thought the technician had cut off from the jury.

I did not emphasize it.

Under these circumstances, the amiable trial court did not abuse its discretion in denying the Boehmers' motion for a mistrial.

We last address the Boehmers' fifteenth point on appeal. Under this point, the Boehmers argue that the trial court erred in denying their motion for a new trial because of the court's conduct at a restaurant during the lunch recess on the last day of trial. We disagree.

On the third day of trial, the Boehmers arrived at a restaurant near the courthouse to eat lunch. Two of the jurors also arrived and sat at an adjacent table. (Both the Boehmers and these two jurors had eaten at the same restaurant on the first two days of trial.) Shortly thereafter, the trial judge entered the restaurant, saw the Boehmers and the jurors, and approached the Boehmers. The judge asked the Boehmers if they knew that the two men at the next table were jurors and then requested that the Boehmers move to a different table. The Boehmers complied. This incident was within the hearing and observation of the two jurors.

■ The present case was tried on December 19, 20, and 21, 1984. The incident at issue occurred on December 21, 1984. The Boehmers first mentioned this occurrence to their attorney on March 1, 1985. Under these circumstances, we find the point waived. A party cannot witness misconduct on the part of the court or the jury and sit by and wait the result of the verdict, and then, if it proves to be against him, object to the alleged misconduct. *Boedges v. Dinges*, 428 S.W.2d 930, 934 (Mo.App.1968). Moreover, the trial court's

actions were neither prejudicial nor improper. The judge merely asked the Boehmers to move away from where the two jurors were eating. As such, his actions prevented the possible violation of MAI 2.01.

Judgment affirmed.

CRANDALL, P.J., and SATZ, J., concur.