Imogene L. VANCIL, Respondent,

v.

Edith CARPENTER, et al., Appellants.

No. WD 51867.

Missouri Court of Appeals,
Western District.

Oct. 29, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 24, 1996.

Dennis P. Colombo, Kansas City, for appellants.

James W. Henry, Kansas City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

ELLIS, Presiding Judge.

On January 13, 1993, Imogene Wicks executed a self-proving will leaving her estate in equal shares to respondent Imogene Vancil and appellants Edith Carpenter and Kevin Kirk. Subsequent to Wicks' death on January 18, 1993, Vancil filed suit in the Circuit Court of Cass County challenging the validity of this will. At the close of evidence, the jury found that Carpenter and Kirk had exerted undue influence on the decedent and declared the 1993 will invalid. Carpenter and Kirk now appeal from that verdict.

The appellants first claim the trial court erred in denying their motion for directed verdict at the close of evidence because Vancil failed to present a submissible case of undue influence. In considering whether the trial court erred in submitting the case to the jury, we must take Vancil's favorable evidence as true, disregard appellants' evidence unless it aids Vancil, and give Vancil the benefit of every favorable inference legitimately drawn from the evidence. *Switzer v. Switzer*, 373 S.W.2d 930, 938 (Mo. 1964).

Wicks was a single, elderly woman who resided in Garden City, Missouri. She had no children of her own, but had numerous nieces and nephews, including Carpenter, Kirk, and Vancil. Wicks and Vancil had an "extremely close" relationship over the years. Carpenter and Kirk were not as close to Wicks as Vancil. Indeed, Kirk visited with her only about once a year.

On February 23, 1990, Wicks executed her first known will naming Vancil as her person-

al representative and sole beneficiary. On December 1, 1992, Wicks suffered a stroke and was hospitalized for eleven days. Subsequent to the stroke, Carpenter and Kirk began spending more time with Wicks than they had in the past. Neither Carpenter nor Kirk attempted to contact Vancil, who resided in Utah, as Wicks' physical condition deteriorated following the stroke.

In the month following the stroke, Carpenter twice went to her aunt's bank and attempted to obtain information about her aunt's accounts. Both times she was denied this information.[1] Sometime in January of 1993, Carpenter scheduled an appointment for Wicks to meet with A.J. Anderson, Wicks' attorney of four years. Carpenter drove Wicks to this appointment on January 11, 1993. Carpenter waited in the reception area while Wicks met privately with Anderson. During this meeting, Wicks asked Anderson to draft a new will making Carpenter her personal representative and leaving equal shares of her estate to Carpenter, Kirk, and Vancil. Because Wicks had recently had a stroke, Anderson asked her to get a written statement from a doctor indicating she was capable of executing a will.

On January 13, 1993, Carpenter, Kirk, and Carpenter's son, Robert, took Wicks to see her doctor. Later that day they escorted her back to Anderson's office. Carpenter and Kirk waited in the reception area while Wicks met with Anderson. During this meeting, Wicks executed the will at issue which was witnessed by Anderson and his secretary. During this meeting, Wicks also signed a power of attorney naming Kirk her attorney in fact.

Also on the afternoon of January 13, 1993, Carpenter and Kirk took Wicks to her bank. While there, Wicks added Carpenter and Kirk to her account, including a right of survivorship among them. Carpenter stayed with Wicks from January 13, 1993, until she died on January 18, 1993.

After Wicks' death, Vancil filed the present action in the circuit court of Cass County. Vancil alleged Wicks was not of sound mind

when the 1993 will was executed, that she did not have the mental capacity to make a will, and that the will was executed as a result of undue influence by Carpenter and Kirk. Following a jury trial on June 28, 1995, the trial court entered judgment that the 1993 will was the result of undue influence and was, therefore, not the last will and testament of Wicks.

 Undue influence means influence that destroys the free choice of the person making the will. *Morse v. Volz*, 808 S.W.2d 424, 432 (Mo.App. W.D.1991) (citing MAI 15.03). In order to break a will, the evidence must show influence amounting to force, coercion, or overpersuasion sufficient to destroy the free agency and will power of the testator. *Id.* The burden is upon the contestant to produce substantial evidence of undue influence. *Id.*

 A presumption of undue influence arises, however, when the evidence shows: (1) a fiduciary relationship existed between the testator and the beneficiary, (2) the beneficiary received a substantial bequest in the will, and (3) the beneficiary was active in procuring the execution of the will. *In re Estate of Hague*, 894 S.W.2d 684, 687 (Mo. App. W.D.1995). "When supported by probative evidence, this presumption makes a prima facie case which does not disappear upon the introduction of rebutting evidence and raises an issue for the jury." *Disbrow v. Boehmer*, 711 S.W.2d 917, 925 (Mo.App. E.D. 1986).

The evidence clearly reflects that Carpenter and Kirk received a substantial bequest when they were each left one-third of Wicks' estate. The remaining elements necessary to warrant the presumption of undue influence, however, are both challenged by the appellants.

Carpenter and Kirk first claim that insufficient evidence was submitted to establish that a confidential or fiduciary relationship existed between themselves and Wicks. "The term 'fiduciary or confidential' within

---

1. During Carpenter's testimony at trial, she denied ever inquiring about her aunt's bank account. This testimony was substantially dis-

credited when a bank employee testified about Carpenter's efforts to obtain her aunt's bank records.

the meaning of the presumption is not used in its strict, formal sense but is equivalent to the confidential relationship between two persons where one trusts and relies on the other." *Disbrow*, 711 S.W.2d at 926. "While a confidential relationship cannot be exactly defined, it usually involves a situation in which one party relies upon another in regard to the handling of property or business affairs." *Moyer v. Walker*, 771 S.W.2d 363, 367 (Mo.App. S.D.1989) (citing *Estate of Brown v. Fulp*, 718 S.W.2d 588, 595–96 (Mo. App. S.D.1986)).

■ In the case at bar, Carpenter had a key to Wicks home and was helping Wicks with physical activities. Carpenter filled out checks for Wicks which Wicks would then sign and turn over to the payee. Sometime in early January, Carpenter took Wicks to a funeral home to plan her funeral. On the day the will was executed, Kirk and Carpenter escorted Wicks to the bank and to her lawyer's office. At the bank, Wicks added Kirk and Carpenter to her account and granted them the right of survivorship. At her lawyer's office, Wicks granted Kirk her power of attorney. The existence of a power of attorney is significant evidence that a confidential relationship has developed. *Estate of Payne v. Howell*, 671 S.W.2d 390, 392 (Mo.App. W.D.1984). On the whole, this evidence sufficiently established that, at the time the will was executed, a confidential relationship of trust and reliance had developed between Wicks and the appellants.

■ With regard to whether Carpenter and Kirk were active in procuring the execution of the will, the evidence is also sufficient. Once the plaintiff has established a confidential relationship and benefaction to the fiduciary, the courts take a very liberal attitude toward the quantum of proof necessary to establish that the fiduciary was actively concerned in some way which caused or contributed to the execution of the will. *Disbrow*, 711 S.W.2d at 926 (citing *Carroll v. Knott*, 637 S.W.2d 368, 371 (Mo.App. E.D.1982)). "The presence of the fiduciary at the execu-

tion of the will and the exertion of his influence at the exact moment of execution need not be shown." *Dobbins v. Hupp*, 562 S.W.2d 736, 741 (Mo.App. W.D.1978).

*Disbrow* held that evidence that Mrs. Boehmer increased her visits to the testatrix two months before the execution of the challenged will, that she saw the testatrix almost every day, that Mrs. Boehmer's husband made arrangements for the testatrix to meet with an attorney to execute the contested documents, and that Mrs. Boehmer prevented the respondent from speaking with the testatrix on two occasions was sufficient evidence to establish her involvement in the procuring of the will and to submit the issue of undue influence to the jury. *Disbrow*, 711 S.W.2d at 926–27.

Similarly, both Carpenter and Kirk increased their contact with Wicks in the month before the contested will was executed. Carpenter was in contact with Wicks almost every day. Neither Carpenter nor Kirk ever contacted Vancil regarding Wicks' condition, and they discouraged efforts by Vancil and her sister to talk with Wicks. One week before Wicks' death, Carpenter phoned Anderson's office to set up the initial appointment for Wicks to see him. Carpenter drove Wicks to the office and waited in the reception area while Wicks met with Anderson. Two days later, Carpenter and Kirk took Wicks to see her doctor. The jury could permissibly infer that this appointment was for the purpose of obtaining the physicians note requested by Anderson. Later that day, Carpenter and Kirk took Wicks back to Anderson's office. Carpenter and Kirk waited in the reception area while Wicks executed the will in question.

We find that Vancil produced sufficient evidence that Carpenter and Kirk were active in procuring the execution of the will. As all three prongs were sufficiently met, Vancil was entitled to the presumption of undue influence.[2] The trial court did not err in submitting this case to the jury.

2. The courts of Missouri have recognized several other factors relevant to determining whether undue influence was exerted over the testator including (1) the physical and mental condition

of the testator, (2) evidence of the power and opportunity to influence the testator, (3) whether the will makes an unnatural disposition of property, (4) whether changes were made from a

■ Appellants' next claim of error arises from the trial court's use of an incorrect verdict director. The trial court accidentally gave the jurors a verdict director which read:

We, the undersigned jurors, find: That the document dated February 23, 1990, (here insert either 'is' or 'is not') the last will and testament of Imogene Rebecca Wicks.

This verdict director did not conform with MAI 36.17, the approved instruction for undue influence, because it called for the jury to make a determination regarding Wicks' first will rather than the will of January 13, 1993. The validity of the first will was not at issue in the case, and little mention was even made of that will during the course of trial.

After deliberation, the jury returned the director, indicating that the will of February 23, 1990, "was" the last will and testament of Wicks (meaning, of necessity, that the jury was finding the will of January 13, 1993 "was not" her last will and testament). The trial court said it would accept the verdict and announced, "Court will stand in recess and discharge the jury." The Court, counsel, and the jury all mistakenly thought that a valid verdict had been returned.

Within seconds after the judge told the jury it was discharged, the erroneous verdict director was discovered. Counsel for both sides met with the judge and agreed that the wrong verdict director had been submitted to the jury because the submitted verdict director was not the one the judge intended to give to the jury and it did not conform with MAI 36.17.[3] In an effort to correct this error, the court decided, with the approval of counsel from both sides, to ask the jury to return to continue their deliberations with the correct verdict director. The record reflects that the jury was recalled and reassembled just three minutes after the judge announced their discharge. The court explained that it had given the jury the wrong verdict form. The court then gave the correct verdict form to the jury, and they retired to further deliberate. The jury took just four minutes before returning the new verdict director indicating that the will of January 13, 1993, "was not" Wicks' last will and testament. The court accepted this verdict and ordered it recorded.

■ While these corrective efforts of the trial court were neither objected to at trial nor challenged in the appellants' briefs, during oral argument, the trial court's power to recall a discharged jury was called into question. In Missouri, a jury, under direction of the court, retains control of its verdict until that verdict is announced and recorded by the court and the jury is discharged. *Keyes*

former will, (5) hostile feelings of the beneficiary toward an expected recipient, (6) remarks of the beneficiary derogatory of the contestant, and (7) actions of the beneficiary in discouraging visits by others. *Carroll v. Knott,* 637 S.W.2d 368, 371 (Mo.App. E.D.1982).

Most of these factors are present in this case. Wicks physical condition was significantly deteriorating. Kirk and Carpenter were afforded the opportunity to influence her. Changes were made from Wicks' former will. Kirk and Carpenter had not spoken with Vancil in a long time, and hostility existed between the parties. The evidence also indicates that when Vancil would call Wicks, the appellants would tell her that Wicks was sleeping and would not let her speak with Wicks. When Vancil had one of her other sisters stop by to check on Wicks, the sister was told Wicks was sleeping. The jury could reasonably conclude that the appellants were discouraging visits by others.

3. The parties and the trial court were correct in their determination that the verdict returned by the jury on the wrong verdict director was insufficient. "A verdict is the sole basis of the judgment to be entered in a jury case and if it is not sufficient to sustain the judgment, the latter is void." *Thorne v. Thorne,* 350 S.W.2d 754, 757 (Mo.1961). "The general rule is that the verdict must be responsive to all the material issues submitted and should find the issues for or against the respective parties." *MFA Coop. Ass'n of Ash Grove v. Elliott,* 479 S.W.2d 129, 133 (Mo.App. S.D.1972). In order for a verdict to be sufficient, it must be clear and definite so that the court may order a judgment without inference, and it is only "sufficiently certain if it finds substantially on the question in issue." *Campbell v. Kelley,* 719 S.W.2d 769, 771 (Mo. banc 1986).

The verdict rendered in this case through the wrong verdict director failed to substantially address the real question at issue: whether the document executed by Wicks on January 13, 1993, was or was not the last will and testament of Wicks? That verdict must, therefore, be declared void. "[W]e must notice as plain error the want of any jury finding sufficient to sustain a valid final judgment ... and cannot base an opinion upon the merits of a void judgment." *MFA Coop. Ass'n of Ash Grove,* 479 S.W.2d at 133.

*v. Chicago, B. & Q.R. Co.,* 326 Mo. 236, 31 S.W.2d 50, 56 (1930); *Welsh v. Burlington N.R. Co.,* 719 S.W.2d 793, 799 (Mo.App.E.D. 1986); *Hary v. Speer,* 120 Mo.App. 556, 97 S.W. 228, 229 (1906). "[A]fter the jury is discharged by the court, the court has no power to recall it to further consider the case or change or correct the verdict, inasmuch as the jury is without further power over the case after its discharge." *Keyes,* 31 S.W.2d at 56. Up until that point, "the trial court has the inherent power and the duty to require that verdicts which ... are defective be corrected before they are finally recorded and made part of the judgment." *Blackman v. Botsch,* 281 S.W.2d 532, 535 (Mo.App. S.D. 1955). This procedure is meant to afford the jury ample opportunity to correct any defects or misunderstandings as to the verdict. *Van Eaton v. Thon,* 764 S.W.2d 674, 677 (Mo.App. W.D.1988); *Welsh,* 719 S.W.2d at 799.

*Keyes* involved a time period similar to that in the case at bar. In that case, the jury mistakenly returned signed verdicts for both the plaintiff and the defendant. Initially, only the verdict for the defendant was noticed by the court. The jury was polled on that verdict and indicated that it was their verdict. The trial court then "dismissed" the jury but asked them to remain in the courtroom. Shortly thereafter, the trial court discovered the second verdict finding for the plaintiff. The trial court announced that it would not receive either verdict, recalled the jury, and ordered them to retire and return another verdict. While the Supreme Court primarily relied on the fact that the court never "received and recorded" the verdict in affirming the actions of the trial court, the Court also expressed doubts as to whether the jury was "discharged," and placed emphasis on the fact that there was nothing in the record to indicate the jury had been tainted with regard to their impartiality or integrity. *Keyes,* 31 S.W.2d at 60.

In *Riley v. St. Louis Public Service Co.,* 245 S.W.2d 666 (Mo.App. E.D.1952), a verdict for the plaintiff was received by the court, recorded, and judgment entered upon it. The jury was dismissed in the case and ordered to report back to the central jury assignment room the next day for any further jury assignments. After the court had recessed for the day, the clerk discovered another verdict had been returned by the jury finding in favor of the defendant. When court convened the following morning, the judge ordered the jury brought back into court and, over the objection of defendant's counsel, questioned them as to their intent in returning both verdicts. After discovering that the verdict in favor of the defendant had been signed and returned to the court by mistake, the court ordered that verdict voided. On appeal, the actions of the court were upheld because no harm resulted and the trial court had pursued "the only logical course that was open to it under the circumstances." *Id.* at 672.

While, in the case at bar, appellants claim that the court's use of the term "discharge" conclusively establishes that the jury was indeed discharged as a matter of law, such a conclusion is "based upon superficial appearances ignoring the absence of substantive reality underlying the surface." *Garland v. National Super Mkts., Inc.,* 696 S.W.2d 342, 344 (Mo.App. E.D.1985). Similar to *Keyes,* the mistake was discovered within minutes of the trial court's comments, and the jury was never allowed to leave the courthouse. Indeed, "[t]he record before us imports that nothing had occurred prior to the recalling of the jury which tended in the slightest degree to affect or influence the impartiality and integrity of the jury." *Keyes,* 31 S.W.2d at 60. Normally, trial judges are encouraged to make every effort to salvage an improper verdict by calling the jurors' attention to their mistake and giving them an opportunity to correct that mistake. *State v. Peters,* 855 S.W.2d 345, 349 (Mo.1993). Both parties and the court agreed that recalling the jury was the appropriate course of corrective action,[4]

---

4. The corrective measures taken in the case were the only logical course of action available to the court short of declaring a mistrial. *Thorne v. Thorne,* 350 S.W.2d 754, 758 (Mo. banc 1961) (After the court accepts a verdict and discharges a jury, the court itself may correct or amend a verdict in matters of form, but never substance.); *Singleton v. Kansas City Baseball & Exhibition Co.,* 172 Mo.App. 299, 157 S.W. 964, 966 (1913) (A court should always require the jury to retire again to correct its verdict or to find a new one, in case of defects or insufficiency.).

and no objection was ever made at trial.[5] We find that under these circumstances, the jury never left the de facto control of the court and was, therefore, never effectively discharged so as to render them *functi officio.*

Furthermore, the trial court has the inherent power, and the duty, to require that verdicts which are inconsistent or defective be corrected by the jury before they are finally recorded and made part of the judgment. *Ralston Purina Co. v. Kennedy,* 347 S.W.2d 462, 466 (Mo.App. S.D.1961). Nothing in the record indicates that the erroneous verdict was finally recorded. After counsel indicated they did not want the jury polled, the trial court merely stated its intention that "[t]he Court then will accept the verdict for the record." The trial court's docket sheet shows no reference to the erroneous verdict. We find the erroneous verdict was never officially "recorded." *See Garland,* 696 S.W.2d at 345. Therefore, regardless of whether the jury was legally "discharged," the actions of the trial court in refusing to record the verdict, and in directing the jury to retire to their jury room and return a verdict, would "in effect, set aside and render naught the discharge of the jury." *Keyes,* 31 S.W.2d at 60.

In the point actually included in their brief, Appellants claim the submission of the first verdict director to the jury so prejudiced their case as to warrant a new trial.

Appellants were afforded ample opportunity to examine the instructions assembled by the court but declined to do so. Appellants never objected to the verdict director prior to its submission to the jury. "No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection." *Rule 70.03; Lindsey Masonry Co. v. Jenkins & Assoc.,* 897 S.W.2d 6, 10 (Mo.App. W.D.1995).

Having failed to properly preserve the issue for appeal, the appellants petition this court for plain error review under Rule 84.13. In order for plain error review to be appropriate, the appellant must demonstrate that the error resulted in a miscarriage of justice or manifest injustice. *French v. Missouri Highway & Transp. Comm'n,* 908 S.W.2d 146, 150 (Mo.App. W.D.1995).

Appellants argue that the use of the incorrect verdict form was presumptively prejudicial and manifest injustice is inherent in their use, thus meriting plain error review. We have already expressly rejected this contention. Verdict forms are not entitled to the same presumption as instructions in connection with preservation of error for appeal. *Lindsey Masonry Co.,* 897 S.W.2d at 11; *Davis v. Stewart Title Guar. Co.,* 726 S.W.2d 839, 857 (Mo.App. W.D.1987). To rule otherwise "would put on the trial court, sua sponte, the absolute duty to commence curative action in every case of possible verdict error." *Lindsey Masonry Co.,* 897 S.W.2d at 11. Moreover, the only evidence here is that the initial use of the incorrect verdict form was not prejudicial. The two verdicts were consistent. The first verdict, finding that the will of February 23, 1990 *was* Wicks' last will and testament, is consistent with the subsequent verdict finding that the will of January 13, 1993 *was not* her last will and testament. There was no evidence of confusion.

Initially the appellant failed to object to the erroneous verdict director at any time before the jury was told they were "discharged." Appellant then failed to object, and even agreed, to the corrective actions taken by the trial court when the mistake was discovered. Whether intentional or not, such "sandbagging" is not condoned by this court. *Id.*

---

**5.** "A party cannot stand idly by not making an objection and not bringing to the attention of the trial court it's errors; gamble on a favorable verdict; and then, when the result is adverse, complain." *Lindsey Masonry Co. v. Jenkins & Assoc.,* 897 S.W.2d 6, 10 (Mo.App. W.D.1995). The reason for this is to make sure the trial court is adequately informed and given a chance to correct its errors. *Id.*

As no manifest injustice appears in the record, we decline to further entertain review. Point denied.

The judgment is affirmed.

All concur.