**Richard and Elizabeth ZEMPEL, Respondents,**

v.

**R.J. SLATER, Appellant.**

No. ED 85109.

Missouri Court of Appeals, Eastern District, Division Five.

Dec. 6, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 19, 2006.

Application for Transfer Denied Feb. 28, 2006.

Jeffrey J. Lowe, Clayton, MO, for respondents.

Samuel T. Vandover, St. Louis, MO, for appellant.

## OPINION

GLENN A. NORTON, Chief Judge.

R.J. Slater appeals the judgment entered after the jury's verdict in favor of Richard and Elizabeth Zempel on their negligence claims arising out of a collision between Slater's car and Richard Zempel's motorcycle. We affirm.

### I. BACKGROUND

This accident occurred on a clear, sunny day in October at the intersection of Route B and Seeburger Road in St. Charles County. The terrain in that area is flat, and the fields at that intersection were cleared on the day of the accident. Richard Zempel and his 11–year old son were traveling in the eastbound lane of Route B on a motorcycle, and Slater was traveling south on Seeburger Road in his car. Slater had a stop sign, but there were no traffic signals applicable to Zempel. Slater testified that he was very familiar with

this intersection and knew there was a stop sign on Seeburger Road but not on Route B. Photographs taken from a point just before and just past the stop sign on Seeburger Road depicted an unobstructed view of Route B. But Slater testified that the photographs did not show that, on the day of the accident, there was traffic and glare from the setting sun. Nevertheless, Slater agreed that he could see "some distance" down, and stated that he had a "sufficient view" of, the eastbound lane of Route B.

Slater testified that he stopped "long before" he got to the stop sign and looked to the left and the right many times. There was a lot of traffic, and after some of the traffic cleared, he advanced past the stop sign, but not onto the paved portion of Route B, and again looked left and right many times. Slater remained stopped just past the stop sign until the traffic cleared. He testified that he had a "sufficient view" of the eastbound lane, then he looked to the westbound lane again and, seeing that all was clear, proceeded at about five miles per hour through the intersection, continually glancing left and right as he crossed Route B. When he was leaving the intersection, there was a crash. He agreed that a portion of his car was still in Zempel's lane at the time of the collision, but Slater said that he never saw the motorcycle and had no explanation for why he had not.

The first officer to respond to the accident testified that Zempel's motorcycle was lying in the eastbound lane of Route B with extensive front-end damage and that there was a skid mark starting 84 feet, 10 inches from the intersection and ending at the motorcycle. Slater's car was off the road against a telephone pole. Over Slater's counsel's objection, the officer discussed a diagram attached to his police report depicting the "area of impact;" it

showed Slater's car positioned in the middle of the intersection with half of the car in the westbound lane and half in the eastbound lane of Route B. Slater's counsel also objected to questions in which the officer was asked to indicate where the impact occurred, and Zempel's counsel withdrew those questions. But the officer did testify that he had determined the area of impact based on the motorcycle's skid mark. On cross-examination, Slater's counsel asked the officer further questions about his determination of the point of impact. The officer first explained that the motorcycle hit the car partly on the passenger-side door and partly on the front fender. The officer agreed with Slater's counsel that, based on where the car was hit and the officer's measurements, at least the front three and half feet of Slater's car was through the intersection when the motorcycle first made contact with it. On re-direct, the officer further explained that, based on the length of Slater's car, it was still blocking the entire eastbound lane of Route B at the point that Zempel's motorcycle and the car collided.

The officer also testified that he detected a "slight" or "faint" odor of alcohol on Slater when talking with him after the accident. When he asked Slater if he had been drinking, Slater told him that he had a "couple of beers at his river house." Slater denied drinking anything on the day of the accident and denied telling the officer that he had. The officer testified that Slater passed an eye gaze nystagmus test and a portable breath test. Ultimately, the officer determined that Slater's blood alcohol content was not above the legal limit and that alcohol had not been a probable contributing cause to this accident. The officer also stated that alcohol affects different people different and has the ability to affect reaction time and perception.

Another officer at the accident scene also testified that he knew Slater had consumed one or two beers, although he could not recall why he concluded that: "it might have been the odor on him or something." He also testified that the portable breath test revealed that Slater had been drinking, but that he was not over the legal limit, which the officer mentioned had been reduced from .10 to .08 since the time of this accident. The officer went on to explain that, in his experience, alcohol affects people differently:

> I've been going on 15 years, and the alcohol—it just depends on the person. We can get a guy that's standing out there drunker than a skunk and he can do that field sobriety perfect, but it just depends on—and if they're an alcoholic, they can handle themselves better, so it all depends on the person.

The officer confirmed that because alcohol was not mentioned in the police report and Slater was not arrested, the other officer did not believe that alcohol contributed to the accident.

Due to closed-head injuries from the collision, Zempel and his son had no recollection of how the accident occurred. This had been the first long motorcycle ride outside of their St. Louis City neighborhood that Zempel had ever taken with one of his sons. Zempel said that "whenever" he takes his sons for rides on the motorcycle, he has them read the speed limit sign to him and then he puts the needle of the speedometer on the speed limit. He said that it was his habit when riding with his sons to always obey the speed limit:

> I never break the speed limit when driving a motorcycle and especially with my son—with any of my children on the back which I didn't do very often anyway. I didn't take the kids for rides. This was the only time we went for a long ride outside the neighborhood.

Zempel's son testified that he had ridden on a motorcycle with his father "maybe 20 or 30 times" and that he had never seen Zempel go over the speed limit while riding with him. He also described how his father asks him to read the speed limit signs and then he looks over his father's shoulder to see the speedometer.

At the conclusion of the Zempels' case and at the close of all evidence, Slater's motions for directed verdict were denied. The jury was instructed to assess a percentage of fault to Slater if he either failed to yield the right-of-way or failed to keep a careful lookout. The court also instructed the jury to assess a percentage of fault to Zempel if he failed to keep a careful lookout or knew or should have known that there was a reasonable likelihood of collision in time to swerve, slow down or sound a warning, but failed to do so. The jury assessed 60% of the fault to Slater and 40% of the fault to Zempel and awarded the Zempels damages. Slater's motion for judgment notwithstanding the verdict, along with other post-trial motions, was denied. He appeals, challenging various evidentiary rulings and the sufficiency of the evidence.

## II. DISCUSSION

### A. Evidentiary Rulings

We will not disturb the trial court's decision regarding the admission of evidence absent a clear abuse of discretion. *Fairbanks v. Weitzman*, 13 S.W.3d 313, 318 (Mo.App. E.D.2000). We find no abuse of discretion in any of the court's evidentiary rulings in this case.

### 1. Evidence of Slater's Alcohol Consumption

■ Slater challenges the admission of the first officer's testimony regarding the odor of alcohol and Slater's consumption of

a couple of beers. Slater contends that this evidence allowed the jury to improperly conclude that he had not seen Zempel due to his alcohol consumption. Slater argues that such a conclusion is speculative because there was no evidence as to when the alcohol was consumed and no evidence that his alcohol consumption affected his ability to perceive, see, hear and recall the accident, caused him not to see Zempel or otherwise impaired him in anyway. The prejudicial effect of the evidence, he maintains, outweighed any slight relevance and was not cured by the limiting instruction. We disagree.

Evidence of a party's alcohol consumption is admissible "if otherwise relevant and material." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 108 (Mo. banc 1996). Here, Slater was not only a party, but also the only witness who could testify about the accident. A witness's alcohol consumption is relevant and material to his ability to see, hear, perceive and observe. *Id.* at 106. Any possible impairment of a witness's ability to recall is relevant to his credibility. *Id.* For those reasons, Slater's alcohol consumption was relevant in this case. Moreover, because the case was submitted on the parties' comparative fault, the evidence of his alcohol consumption is especially relevant. *See Stewart v. Carron*, 938 S.W.2d 636, 640 (Mo.App. E.D.1997).

*Stewart* involved a head-on car collision, and the case was submitted on the drivers' comparative fault. *Id.* at 636–37, 638. Evidence of the plaintiff's intoxication was admitted into evidence, but the trial court refused to allow evidence that the defendant drank four beers at a bar before the accident. *Id.* at 637. The officer at the scene of the accident testified that the defendant " 'was not under the influence of alcohol that in any way caused or created the accident.' " *Id.* at 638. Due to his

injuries, the plaintiff had no recollection of the accident or the events before it. *Id.* at 637. This Court reversed the trial court's finding with respect to evidence of the defendant's alcohol consumption based on the "relevant and material" standard in *Rodriguez:*

> Evidence of defendant's consumption of alcohol prior to the accident bears on his ability to see, hear, perceive and observe his surroundings and would enable a jury to be more fully informed in order to determine the relative fault of the parties.

*Id.* at 640. This evidence was especially relevant because the defendant was the only witness who could testify about what occurred before and during the accident. *Id.*

As Slater points out, there is not similar evidence of the plaintiff's intoxication in this case. While that *may* influence a determination of the relevance of a defendant's drinking for purposes of comparative fault, the Court in *Stewart* did not rely on that evidence. Rather, the argument on appeal in that case, and the Court's opinion, focused on the probative value of alcohol consumption on the defendant's ability to observe his surroundings at the time of the accident. *Id.* at 638–39. In any case, *Stewart* is still instructive for its other factual similarities and to contradict Slater's suggestion that specific testimony about the effect of the alcohol on the defendant is required for this type of evidence to be admissible. In *Stewart* there was no such evidence, and, in fact, requiring evidence of the effect the alcohol had on the person would be similar to the requirement for admissibility that *Rodriguez* did away with: "[p]reviously, in a negligence action, evidence of a driver's alcohol consumption was admissible only if coupled with evidence of erratic driving or *some other circumstance from which it*

*might be inferred that the driver's physical condition was impaired at the time of the accident.*" 936 S.W.2d at 106 (emphasis added). The absence of that evidence and any further details about the time of consumption go to the weight of the officer's testimony, not to its admissibility.

At oral argument, Slater's counsel insisted that this case was analogous to *Hosto v. Union Electric,* where this Court affirmed the trial court's decision to exclude evidence of alcohol consumption. 51 S.W.3d 133, 143–44 (Mo.App.E.D.2001). In that case, a helicopter crashed into power lines, killing the pilot and his passenger. *Id.* at 136. The decedents' families sued the power company. *Id.* at 137. The trial court refused to submit an instruction alleging the passenger's comparative fault for getting in the helicopter with the pilot whose blood alcohol content was .114 and also refused to admit evidence that the passenger's blood alcohol content was .08. *Id.* at 143. On appeal, the power company argued that this evidence was relevant and created an inference that the passenger and the pilot were drinking together all day, which showed her knowledge of his impaired condition and supported the comparative fault instruction. *Id.* This Court found that, unlike *Rodriguez*—in which the passenger's comparative fault was submitted on evidence that her blood alcohol content was over the legal limit and she admitted drinking with the intoxicated driver before getting in the car—there was no evidence that the helicopter passenger consumed alcohol with the pilot and her blood alcohol content was lower than the .10 legal limit. *Id.* at 144.

This case is distinguishable from *Hosto* primarily because the evidence was offered for a different purpose than was the evidence at issue here. In *Hosto,* the defendant was trying to prove that the passenger and the pilot drank together to show

her knowledge that the pilot was intoxicated for purposes of her comparative fault. Here, however, evidence of Slater's alcohol consumption was offered in regards to his ability—as the only witness who could testify about the accident and as the driver of the car involved in the accident—to see, hear, perceive and observe his surroundings. Moreover, in *Hosto,* the evidence of the pilot and the passenger's blood alcohol content, without more, did not show that they had been drinking together all day or that the passenger knew that the pilot was intoxicated. Here, on the other hand, there was evidence that Slater had consumed alcohol; nothing in *Hosto* or any case law required the Zempels to show that his blood alcohol content was over the legal limit for that evidence to be admissible.

Furthermore, contrary to Slater's argument, the probative value of the officer's testimony with respect to Slater's credibility as a witness and to his fault in the accident was not outweighed by the possibility that the testimony would be prejudicial. And, in any case, the court and counsel took measures approved by the Supreme Court to diminish any undue prejudice. *See Rodriguez,* 936 S.W.2d at 108. First, the court gave a limiting instruction, at Slater's request, which precluded the jury from considering the evidence that he had consumed two beers as an independent act of negligence. Moreover, the evidence of alcohol consumption was put into context by both officers' testimony that Slater's blood alcohol content was not above the legal limit and that alcohol had not been a probable contributing cause to this accident. In addition, Slater denied that he had anything to drink the day of the accident and denied that he had told the officer that he had been drinking. In closing argument, Slater's counsel pointed out the conflict between Slater's denial and the officer's tes-

timony, asked the jury to consider who was telling the truth and argued that the alcohol evidence was an effort to throw a side issue into the case. Counsel then reminded the jury that the evidence showed that Slater had passed the sobriety tests and that the odor of alcohol was "about him," not on his breath. The arguments of counsel, the other evidence and the limiting instruction were sufficient to lessen the prejudice that may have resulted from the admission of the evidence of Slater's alcohol consumption.

Point I is denied.

## 2. Other Testimony Regarding Alcohol

■ Slater contends that the second officer's comment that an alcoholic or someone "drunker than a skunk" might still pass a field sobriety test and reference to the change in the legal limit was irrelevant, highly prejudicial and without foundation. Slater argues that the officer had no personal knowledge that he had been drinking because the officer was unsure about why he knew Slater had consumed one or two beers and had trouble recalling any details of this incident. He claims also that mentioning the new lower legal limit implied that Slater would have been over the limit under the new law. The prejudicial effect of this implication, Slater claims, was made worse by the officer's testimony about the general effects of alcohol on other people. We disagree.

First, the equivocation and problems with recall in the officer's testimony go to the weight of this testimony, not its admissibility. *Cf. State v. Holmes*, 823 S.W.2d 55, 57 (Mo.App. E.D.1991) (foundational testimony regarding identification of physical evidence need not be free from doubt to be admissible; such questions of weight are for the jury). This officer's testimony regarding Slater's alcohol consumption—that he had one or two beers and that the

portable breath test revealed Slater had been drinking—was admissible for the same reasons discussed above: it was relevant, and its relevance was not outweighed by undue prejudice. *See* section II.A.1, *supra.*

■ Second, the officer's mention of the change in the legal limit and his testimony about the effects of alcohol on other people was also admissible. In his argument to the contrary, Slater relies on *Yingling v. Hartwig*, 925 S.W.2d 952, 956 (Mo.App. W.D.1996). In that personal injury case, the defendant's medical expert testified that there was a difference between complaints made by patients not in litigation and those made by patients in litigation. *Id.* at 955. The court called these statements "generalities, without any indication of similarity with or application to [the plaintiff]" and denounced their use:

> A court of law is not a public forum, and witnesses are not permitted to make general declarations about matters wholly unrelated to the parties. Statements about unidentified people with unidentified injuries and complaints are irrelevant to prove whether [the plaintiff] continues to suffer from her injuries, one of the issues at trial, and the trial court abused its discretion in admitting the testimony.

*Id.* But there is no abuse of discretion in admitting testimony regarding generalities if the witness also compares or applies those general principles to the specifics of the particular case. *See, e.g., Disbrow v. Boehmer*, 711 S.W.2d 917, 923–24 (Mo. App. E.D.1986). In *Disbrow*, the plaintiff sought to set aside her mother's will and offered expert testimony about the general symptoms of arteriosclerosis—a disease her mother had—and its effects on one's mental faculties. This Court disagreed that the evidence was irrelevant and spec-

ulative because, after testimony regarding the general symptoms of the disease, the expert went on to explain how the disease affected the testatrix, which was relevant to her testamentary capacity. *Id.* at 924. Under those circumstances, it was not an abuse of discretion to admit the expert's testimony. *Id.*

■ According to the reasoning in the above cases, the officer's testimony in this case about the effects of alcohol on people generally was admissible because he also testified—albeit indirectly—about the effects of alcohol on Slater in this case. Namely, the officer testified that failure to include alcohol on the police report indicated that alcohol had not contributed to this accident. Slater claims that any benefit from this testimony was weakened substantially by the inflammatory and misleading implications that Slater had skillfully fooled the officers despite his drunkenness. But the officers had already testified that Slater's blood alcohol content was not above the legal limit based on the portable breath test. There was nothing in either of the officers' testimony to suggest that Slater could have fooled the portable breath test. At best, one could conclude that he was drunker than he appeared, but still not drunk enough according to the portable breath test to have been arrested or to have caused one to conclude that alcohol contributed to accident. Slater suffered no prejudice from that inference. Moreover, without more, merely mentioning the change in the law does not create an unfairly prejudicial inference that Slater would have been over the new lower limit; even if that could be inferred, again it was not prejudicial in light of the evidence that alcohol did not contribute to the accident. Finally, the curative measures discussed above served to lessen any prejudice attending these comments. *See* section II. A.1, *supra.*

Point II is denied.

### 3. Habit Evidence

■ Slater argues that the trial court erred by admitting evidence that Zempel had a habit of obeying the speed limit. He argues that the ride Zempel and his son took on the day of the accident was unlike any previous rides they had taken and, therefore, there was no foundation for admitting evidence of his habits on those other rides. Slater also contends that this evidence did not constitute a true habit because Zempel's compliance with the speed limit was not automatic and was dependent on too many conditions, namely, being on a motorcycle with his son. Finally, Slater argues that Zempel's and his son's testimony was self-serving and was in the present tense, which does not demonstrate that the habit existed before the time of the accident. We find no merit in any of these arguments and no clear abuse of the trial court's decision regarding the admission of this evidence. *See Fairbanks,* 13 S.W.3d at 318.

■ From the rare occasions on which Missouri courts have addressed the admissibility of habit evidence, the following principles emerge. Habit evidence " 'is relevant to prove that the conduct of the person ... on a particular occasion was in conformity with the habit or routine practice.' " *Hawkins v. Whittenberg,* 587 S.W.2d 358, 364 n. 2 (Mo.App. S.D.1979) (quoting FED.R.EVID. 406).[1] The admissibility of habit evidence should be restricted and kept within narrow limits. *Hawkins,* 587 S.W.2d at 363 (citing *Hodges v. Hill,* 175 Mo.App. 441, 161 S.W. 633, 636

---

1. As other courts have pointed out, Missouri has not adopted the federal rules. *See, e.g.,* *State v. Hemby,* 63 S.W.3d 265, 269–70 (Mo. App. S.D.2001).

(1913)).[2] A habit is a person's " 'regular practice of meeting a particular kind of situation with a specific type of conduct.... The doing of habitual acts may become semi-automatic.' " *Hawkins*, 587 S.W.2d at 364 n. 2 (quoting McCormick On Evidence § 195, at 462–63 (2d ed.)). To be admissible, the habit must be " 'sufficiently regular and uniform, or the circumstances sufficiently similar to outweigh the danger, if any, of prejudice or confusion.' " *Hawkins*, 587 S.W.2d at 364 n. 2 (quoting McCormick, *supra*, § 195); *see also State v. Ernst*, 164 S.W.3d 70, 74 (Mo.App. S.D. 2005) (using above principles to conclude that evidence of one incident was insufficient proof of the defendant's habit or routine).

Here, the evidence that Zempel *always* obeyed the speed limit when riding with his sons is proper habit evidence and was admissible. The testimony demonstrates that it was Zempel's regular practice every time he had one of his sons on the motorcycle to obey the speed limit, which practice he maintains by having his son read the speed limit sign and then putting the needle of the speedometer on that limit. In this way, the conduct could be construed as having become semi-automatic. The fact that the ride on the day of the accident was the longest ride Zempel had ever taken with his son does not render the habit evidence inadmissible because the habit was to obey the speed limit *whenever* his son was on the motorcycle with him; there was nothing in the testimony to suggest that Zempel's conduct differed depending on the length of the ride. Therefore, the circumstances under which Zempel testified he always obeyed the speed limit were sufficiently similar to

the circumstances on the day of the accident. Although their testimony was largely in the present tense, it was clear that both Zempel and his son were referring, at least in part, to the shorter rides taken before the day of the accident. Moreover, although this was the first long ride, Zempel's son had been on 20 or 30 motorcycle rides with his father and every time Zempel obeyed the speed limit. This is an adequate sampling of Zempel's conduct from which to conclude that this was his regular practice and distinguishes this case from those cited by Slater. *See Reyes v. Missouri Pacific Railroad Co.*, 589 F.2d 791, 795 (5th Cir.1979) ("four prior convictions for public intoxication spanning a three and one-half year period are of insufficient regularity to rise to the level of 'habit' evidence"); *McWhorter v. City of Birmingham*, 906 F.2d 674, 679 (11th Cir. 1990) (testimony of four other officers did not establish party's habit of harassing police officers).

Point III is denied.

#### 4. Point of Impact Evidence

Slater argues that the officer's testimony as to the point of impact and the diagram depicting the point of impact were inadmissible because expert opinion testimony is not permitted as to point of impact in a collision case.

First, the questions Zempel's counsel asked regarding the officer's determination of the point of impact were withdrawn after Slater's counsel objected; thereafter, the officer merely testified as to how he arrived at that determination based on his perceptions of the skid marks on the road, which is not testimony that Slater challenges on appeal. Rather, the

**2.** The court in *Hawkins* pointed out that the precedential value of *Hodges* is questionable because the *Hodges* court expressed doubt as to its correctness and concluded that, even if

improperly admitted, the habit evidence was not prejudicial. *Hawkins,* 587 S.W.2d at 363–64.

officer only testified as to his determination of where the impact occurred during cross-examination by Slater's counsel. A party cannot complain that the trial court improperly admitted evidence that was introduced by that party. *Foster v. Village of Brownington,* 140 S.W.3d 603, 609 (Mo. App. W.D.2004). Even if Slater could complain about that evidence on appeal, the officer's testimony was consistent with Slater's version of the accident. Slater's counsel even relied on the officer's testimony that the point of impact was near the south side of the road to argue that, with Slater's car that far across the intersection, Zempel had time to see him and avoid hitting him. Therefore, the officer's testimony was not unfairly prejudicial to Slater, and there was no clear abuse of discretion in admitting it. *See Fairbanks,* 13 S.W.3d at 318.

■ The diagram depicting the point of impact was also admissible. Although it shows Slater's car in the middle of Route B at the point of impact—with the back end of the car in the westbound lane and the front end in the eastbound lane—the officer's testimony during cross-examination clearly indicated that (1) no part of Slater's car was in the westbound lane at the point of impact, (2) the impact occurred when Slater's car was much closer to the south edge of the road, and, in fact, (3) part of Slater's car had already passed through the intersection by that time. The conflict between the diagram and the officer's testimony does not, as Slater contends, render admission of the diagram erroneous. Complaints about inconsistencies in the evidence go to weight, not to admissibility. *Brandt v. Pelican,* 856 S.W.2d 658, 663 (Mo. banc 1993). And, again, Slater's counsel relied on the contradictory—and favorable—testimony of the officer to lessen any prejudice attending the diagram. It was not a clear abuse of

the trial court's discretion to admit the diagram. *See Fairbanks,* 13 S.W.3d at 318.

Point VII is denied.

## B. Sufficiency of the Evidence

■ Slater challenges the submission of the verdict-directing instruction regarding his failure to yield the right-of-way or failure to keep a careful lookout; he also challenges the denial of his motions for directed verdict and for judgment notwithstanding the verdict. The propriety of these rulings all ultimately depend on whether there was substantial evidence that Slater failed to yield the right-of-way and failed to keep a careful lookout. *See generally Romeo v. Jones,* 144 S.W.3d 324, 330 (Mo.App. E.D.2004) (each alternative in disjunctive instruction must be supported by substantial evidence); *Erdman v. Condaire, Inc.,* 97 S.W.3d 85, 88 (Mo. App. E.D.2002) (directed verdict and judgment notwithstanding the verdict both depend on whether plaintiff presented substantial evidence for every fact essential to liability). These are questions of law, and we view the evidence and all reasonable inferences therefrom favorably to the Zempels in this case and disregard the unfavorable inferences. *See Romeo,* 144 S.W.3d at 330; *Hudson v. Whiteside,* 34 S.W.3d 420, 427 (Mo.App. W.D.2000); *Erdman,* 97 S.W.3d at 88.

■ Every motorist operating a vehicle must "exercise the highest duty of care to maintain a careful lookout ahead and laterally upon entering an intersection." *Blackshiers v. Harris,* 980 S.W.2d 189, 190 (Mo.App. E.D.1998). This duty requires drivers to make careful observations to determine whether there is any cross traffic in or so near the intersection as to constitute an immediate danger. *Hudson,* 34 S.W.3d at 427. To make a submissible case that the defendant failed

to yield the right-of-way at a stop sign, the plaintiff must establish that his vehicle was so close to the intersection that it was an immediate hazard. *Id.* at 429. The evidence can include, among other things, the plaintiff's speed, the location of the collision and the distance one could see in the plaintiff's direction from the stop sign; when coupled with evidence of the stop sign's location, the collision and damages, the plaintiff makes a submissible case. *Id.* To make a submissible case of failure to keep a careful lookout, the plaintiff must establish that the defendant saw or could have seen the plaintiff in time to have avoided the collision. *Id.* at 427. The defendant is "held to have seen what looking would reveal." *Id.* Normally, the plaintiff must establish the time when and the distance at which the potential danger of collision triggered the defendant's specific duty to take effective precautionary action. *Morgan v. Toomey*, 719 S.W.2d 129, 133 (Mo.App. E.D.1986). In certain fact situations, however, our courts have found it unnecessary to prove time and distance. *See, e.g., Hudson*, 34 S.W.3d at 428–29.[3]

In *Hudson*, the plaintiffs' car was in the flow of traffic when they saw the defendant's car stopped at a stop sign at an intersection 20 feet away. *Id.* at 421. The plaintiffs did not have a stop sign. *Id.* Once into intersection, the plaintiffs saw that the defendant's car was just a few feet in front of their car, and the cars collided. *Id.* at 422. The defendant never saw the plaintiffs' car, although his view from the stop sign was unobstructed for 1,125 feet in the direction from which the plaintiffs were traveling. *Id.* The case was submitted on alternative theories that the defendant had failed to yield the right-of-way or failed to keep a careful lookout. *Id.* The court found that the effective precautionary measure would have been for the defendant to have remained stopped and to have refrained from pulling out into the intersection in front of the plaintiffs' car. *Id.* at 428–29. There was sufficient evidence that the defendant could have seen the plaintiffs' car in time to avoid the collision and that the defendant created the danger of a collision by failing to see the plaintiffs' car before pulling out in front of it. *Id.* at 429. The plaintiffs, therefore, made a submissible case for failure to keep a careful lookout. *Id.* Moreover, the plaintiffs' distance from the stop sign and their speed, the defendant's unobstructed view and the fact of the collision was sufficient evidence from which the jury could decide whether the plaintiffs'

---

**3.** *See also McWilliams v. Wright*, 460 S.W.2d 699, 702 (Mo.1970) (eastbound driver made submissible case against westbound motorcyclist based on evidence that driver saw motorcyclist more than 1,300 feet from point of impact, that immediately before collision, motorcyclist swerved into car after noticing car's headlights right in front of him and that view in both directions was unobstructed—motorcyclist created danger of collision by swerving in reaction to headlights he obviously could have and should have seen much earlier and could have effectively avoided danger by staying in own lane); *Williams v. Christian*, 520 S.W.2d 139, 142 (Mo.App.1974) (pedestrian struck while standing on side of road made submissible case based on evidence that pedestrian first saw car when it was two houses away driving straight on the road—effective precautionary action would have been to continue on the road and refrain from driving onto shoulder); *Morgan*, 719 S.W.2d at 135 (plaintiff standing in parking lot struck by car made submissible case against driver based on evidence that car was 40 to 50 yards from plaintiff at time he started driving straight down the aisle at 10 to 15 miles per hour toward the plaintiff, that driver's view was unobstructed; that plaintiff and others standing near him saw car, thus driver should have been able to see the plaintiff, and that driver swerved out of aisle at some unknown time and distance and struck plaintiff—if driver would have continued driving straight in the aisle, then he would have avoided the collision).

car presented an immediate hazard and, therefore, the plaintiffs made a submissible case for failure to yield the right-of-way. *Id.*

Similarly, here, the evidence demonstrates that the effective precautionary measure would have been for Slater to have remained stopped instead of creating a hazard by pulling out into the intersection. There was substantial evidence from the photographs and Slater's own testimony that his view down Route B in the direction from which Zempel was traveling was unobstructed. Slater's argument on appeal relies on the "contrary" evidence that his view was impaired by sun and traffic on the day of the accident. To the extent that evidence raises an inference unfavorable to the plaintiffs' case, we disregard it on appeal. *See id.* at 427. Moreover, regardless of what else affected his view, in describing the distance between cars in the flow of that traffic, Slater implied that he could see at least 300 feet down Route B:

> ... Now [the westbound vehicles] were not in a parade necessarily, but that traffic was generally moving towards the sun. There was other traffic coming from the west to the east. It was automobile traffic. You would see 1, 2 or 300 feet back you would see another one, so the traffic was flowing from the west to the east and also from the east to the west as I remained stopped there.

Furthermore, Slater agreed that he could see "some distance" down, and stated that he had a "sufficient view" of, the eastbound lane of Route B.

There was also sufficient evidence from which the jury could determine how far away the motorcycle was from the intersection when Slater entered it: there was evidence that Zempel was traveling the speed limit in conformity with his habit and that the speed limit was 55 miles per hour on that part of Route B; that, at 55 miles per hour, a vehicle travels 82.5 feet per second; that Slater was traveling 5 miles per hour across Route B, which was 22 feet, 9 inches wide; that, at 5 miles per hour, a vehicle travels 7.5 feet per second; that a driver's reaction time is 3/4 of a second; and that Zempel's motorcycle left a skid mark starting 84 feet, 10 inches from the intersection. In fact, in the context of Zempel's comparative fault for the accident, Slater's counsel argued that this evidence showed that Zempel's motorcycle was between 268 and 330 feet from the intersection when Slater entered it and, therefore, Zempel could have seen Slater in time to avoid the collision. Likewise, this was substantial evidence from which a jury could conclude that Slater failed to keep a careful lookout because he could have or should have seen Zempel. Moreover, this was substantial evidence from which a jury could conclude that the motorcycle presented an immediate hazard and Slater failed to yield the right-of-way. Therefore, it was proper to give the verdict-directing instruction on both theories and to deny the motions for directed verdict and for judgment notwithstanding the verdict.

Points IV, V and VI are denied.

## III. CONCLUSION

The judgment is affirmed.

ROBERT G. DOWD, JR., J. and JAMES R. REINHARD, SR., J. concurring.